No. 34,214

THE STATE OF KANSAS, *Appellee*, v. MELVIN O'NEAL, *Appellant*.

(91 P. 2d 12)

Opinion filed June 10, 1939.

*Laurence M. Turner,* of Moline, and *Thomas E. Wagstaff,* of Independence, for the appellant.

*Jay Parker,* attorney general, *A. B. Mitchell,* assistant attorney general, *Frank Organ,* of Howard, and *Ralph R. Rader,* county attorney, for the appellee.

The opinion of the court was delivered by

ALLEN, J.: The defendant was prosecuted on an information charging burglary and grand larceny. He was found guilty of grand larceny, and appeals.

The information charged that the defendant Melvin O'Neal, together with Walter Kimzey and Buck Hughes, codefendants, on the 12th day of April, 1938, did unlawfully, feloniously and burglariously break and enter a warehouse belonging to Elk county, Kansas, and did steal, take and carry away certain gasoline, oil and grease belonging to Elk county of the aggregate value of $41. The defendants Kimzey and Hughes pleaded guilty to grand larceny, and testified on the trial of the defendant O'Neal.

It is asserted the trial court erred in permitting the state to introduce evidence of unrelated offenses.

The warehouse of Elk county is located about three or four miles north of Longton, in Elk county. Two employees of the county testified that on the morning of April 13, 1938, they found a lock on the door to the warehouse had been broken and certain drums or containers of oil, gasoline and grease had been taken from the warehouse.

Walter Kimzey, one of the original codefendants, testified that on the night of April 12, 1938, accompanied by Buck Hughes and the

defendant O'Neal, the party of three went to an oil rig located about two miles northwest of the home of the defendant, and there they got some wrenches and an empty barrel; they then went to the Griffin lease across the line in Chautauqua county, where they got a barrel of oil and a belt; that they then returned to the home of the defendant and unloaded the property they had gathered up; that they then went to the county warehouse where they got out of the building the gasoline, oil and grease described in the information; that the defendant was present and helped load the material; that they then drove to a pasture south of Longton, where the property was unloaded and where it was subsequently found.

The testimony of Buck Hughes was in substance the same as the testimony of Kimzey. When asked how much motor oil they got he stated: "I don't know. It all spilled out before we got home. I don't know how much."

Ben Carter, sheriff of Elk county, testified that he went to the warehouse on April 13, 1939, to make an investigation. He testified:

"Q. Tell us what investigation you made when you got there. A. I went down there and went out to the warehouse and when I got there there was a latch on the door and there had been a staple through there and this hasp had been fastened over this staple and there had been a padlock in the door, and the lock was laying on the ground. It was still locked, but the staple was out of the door where it was fastened.

"Q. Was the door open? A. The door was open.

"Q. Where did you go from there? A. I looked around there and we found some car tracks. These tracks was kind of truck tracks and they was All-State tires and knobby tires, and on the left rear wheel the tread was wore off pretty bad, and the tire on the right wheel was in pretty good shape and it made a good track, and the left wheel on this truck had a wobble in it, and didn't run true. We left there and went to Longton. A road leads over east, and when I came to the road I found the tracks going east, and I went down there and these tracks east was knobby tires also, but they was new, and I didn't follow them any further, and turned and came back to the road. But when I was following these tire tracks every once in a while when you would come to a little hill there would be oil dropped out of the back end on the ground, and when I went over east there was no oil, and it was a different track, because it was a better tread on them. I went south up over the Jones hill and there was quite a bit of oil along the hill. It's a rather steep hill and the oil had run out rather freely going up. And on south of this road leads to a road down about a mile north of the county line, probably half a mile, and a road goes east and west, and the north-and-south road has a little bend in it around over a culvert, and when they came to these four corners I suppose they had stopped, but a puddle of oil run out about as big as a man's hat. It looked like they had stopped there. I went on south and I couldn't find no tracks any further south and I came back and went east, and

I found where the car had went east, and I came on back and I didn't follow it only about a mile, I think, east, and I came back, and I went to Melvin O'Neal's house, and this car track had went in his driveway there. He wasn't home. His wife wasn't home. I went from there to Kimzey's and this car track had gone into Kimzey's yard. He lives on this road north and south, and O'Neal is about half a mile south of Kimzey and about three-quarters of a mile west, and I found these tracks leading into both places, and I went over south into Chautauqua county and I looked around down there, but I couldn't find no tracks south and I came back and come home. That was on the 13th day of April, 1938.

"Q. Mr. Carter, this place where you say there was quite a spot of oil on the ground, that is a crossroad, is it not? A. Yes, sir. .

"Q. A road running north and south and one east and west? A. Yes, sir.

"Q. And that is about how far west of the Cove schoolhouse? A. About a mile east of the Cove schoolhouse.

"Q. From that crossroad how far is it and what direction to O'Neal's house? A. It's about three-quarters of a mile west to where Melvin O'Neal lives.

"Q. You saw this track going into this place? A. Yes, in his driveway, and turned around by the house."

On the following day the sheriff went to the home of Walter Kimzey and found Kimzey and the defendant O'Neal sitting in O'Neal's car in the yard. Shortly after he arrived, O'Neal backed his car out and drove away. The sheriff further testified:

"A. The truck corresponded with the tracks and the tires was All-State tires, knobby tread on the two rear wheels and the right rear wheel was in good shape, and on the left it was pretty well worn, and the truck had grease all over it, and there was grease on the hind wheels and in the bed and on the differential like it had went down through the truck dripping out.

"Q. Did you observe the track the truck made in the yard? A. Yes, sir; it made the same kind of track I had been following all the time.

"Q. And the same kind as the one in which O'Neal drove away? A. Yes, sir."

The sheriff testified that Kimzey and Hughes told him where the property taken from the warehouse was cached, and that such property was found at the place so described.

Defendant contends the evidence admitted as to the offenses committed in Chautauqua county for which he was not on trial was prejudicial to him and might have been the basis for the verdict returned.

In *State v. Adams*, 20 Kan. 311, the defendant was charged with the crime of burglary, and alleged the court erred in admitting evidence which tended to show the defendant guilty of a separate unrelated crime. The court said:

"The rule of law applicable to questions of this kind is well settled. It is

clear that the commission of one offense cannot be proven on the trial of a party for another, merely for the purpose of inducing the jury to believe that he is guilty of the latter, because he committed the former. You cannot prejudice a defendant before a jury by proof of general bad character, or particular acts of crime other than the one for which he is being tried. And on the other hand, it is equally clear, that whatever testimony tends directly to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. (*The State v. Folwell,* 14 Kan. 105.) A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him. A man may commit half a dozen distinct crimes, and the same facts, or some of them, may tend directly to prove his guilt of all; and on the trial for any one of such crimes it is. no objection to the competency of such facts, as testimony, that they also tend to prove his guilt of the others. By this rule, whatever is done in preparation for a crime, or in concealing the fruits, is competent, although in such preparation or concealment is committed another and distinct offense. . . ." (p. 319.)

In *State v. King,* 111 Kan. 140, 206 Pac. 883, the admissibility of evidence touching separate crimes perpetrated by a defendant on trial for a specified offense was considered and the authorities reviewed. It was there said:

"The ordinary rule, of course, is that evidence of extraneous crimes is not admissible. But to that rule there are many well-recognized exceptions which are as potent as the rule itself. Any pertinent fact which throws light upon the subject under judicial consideration—the accused's guilt or innocence of the crime for which he is charged and on trial—is admissible; nor is such probative fact to be excluded merely because it may also prove or tend to prove that the accused has committed another crime or many crimes. . ." (p. 144.)

The testimony was clearly admissible. The defendant with his confederates had engaged in a series of depredations immediately preceding the commission of the crime charged. At the first stop—an oil rig two miles northwest of the home of defendant—wrenches were secured. As the lock on the door of the warehouse was broken, it is a fair inference the wrenches were secured in preparation for breaking and entering the warehouse. The evidence revealed a pre-existing design and plan to steal oil and gasoline, and the empty barrel secured at the time the wrenches were taken was further evidence of preparation to carry out such plan and design. The evidence was also admissible to repel the defense of an alibi interposed by defendant. The various raids were so closely related in point of time as almost to amount to inseparable acts, and clearly disproved the contention of defendant that he was elsewhere at the time.

It is also contended that the verdict is based on the uncorroborated testimony of the accomplices, Kimzey and Hughes, and therefore a new trial should be granted. The answer to this assertion is found in the testimony of the sheriff. By following the knobby tracks of the tires used on the truck and the oil drippings, the officer was led from the warehouse to the home of the defendant—and the truck when found was smeared with oil and grease. We see no merit in this contention. Moreover, in this jurisdiction the uncorroborated testimony of an accomplice in a crime, if otherwise sufficient and given full credence by the jury, will sustain a verdict of guilty. (*State v. Carter,* 148 Kan. 472, 83 P. 2d 689; *State v. McIntyre,* 132 Kan. 43, 48, 294 Pac. 865. See, also, 4 Wigmore on Evidence, §§ 2056, 2057; *State v. Carey,* 76 Conn. 342, 56 Atl. 632.)

Finding no error in the record, the judgment must be affirmed. It is so ordered.