No. 34,514

THE STATE OF KANSAS, *Appellee*, v. PAUL F. CRIGER, *Appellant*.

(98 P. 2d 133)

Opinion filed January 27, 1940.

*Walker F. Means* and *W. E. Archer*, both of Hiawatha, for the appellant.

*Jay S. Parker*, attorney general, *A. B. Mitchell*, assistant attorney general, and *Harry E. Miller*, county attorney, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Paul F. Criger was charged with murder in the first degree of his wife at their home in Morrill, Kan., on the morning of March 13, 1939. He was tried and found guilty of murder in the second degree and sentenced to imprisonment for fifteen years. He has appealed and contends that the verdict is not sustained by the evidence; that the trial court erred in several important rulings on the admission of evidence; in overruling his motion to be discharged upon the admissions and statements of counsel for the state made in his opening statement; in overruling his motion to be discharged, made at the conclusion of the state's evidence; and in overruling his motion for a new trial.

We shall consider first whether the evidence was sufficient to sustain the verdict. The facts, not controverted, or which the jury and trial court were entitled to believe, may be summarized as follows: At the time of the tragedy defendant was twenty-two years of age. He had lived at Morrill about seven years. Prior to that time he had lived at Maryville, Pickering and Trenton, Mo. On December 22, 1937, he was married to Ida May Lufler, about his own age, who had been reared in the vicinity of Morrill. For the first ten months of their married life the couple made their home

with defendant's mother, Mrs. Green, who lived in Morrill. Then they bought a small house situated in the same block with the home of his mother, on which he had made a down payment and was making periodical payments. The block in which these residences are situated is near the edge of the town, and while there is quite a little space between the houses, there is no other building in the space. Defendant was a WPA worker. The house purchased by defendant, and in which he and his wife were living at the time of the tragedy, had two rooms on the first floor and a bedroom upstairs. Its outside dimensions were 14 by 24 feet, and on the interior it was divided into two rooms, the west front room being a little larger than the east room, used as a kitchen and dining room. The front room was carpeted; it was furnished with a davenport near the north side of the room, a table near the south side, a stove near the east side, and chairs. Near the south side of the partition between the two rooms a door from the front room opened into the stairway, two and one-half feet wide. Directly north of this stairway was the door, two and one-half feet wide, between the front room and the kitchen; otherwise there was no opening in the partition. In the kitchen east of the stairway was a pantry, the width of the stairway, two and one-half feet north and south and about five or six feet long, extending to the east wall of the room. There was a door on the south into the pantry, hung on the east wall of the room, which opened to the north. In this pantry was a .22 rifle and a sawed-off 12-gauge shotgun. This is spoken of as being eighteen inches long. There were also pans and various articles usually kept in such a pantry. The furniture of the kitchen consisted of a dining table, placed against the east wall, with a chair to the north and another to the south of it, a refrigerator near the center of the room but against the north wall, a chair directly west of it, a washstand near the northwest corner of the room, an oil cookstove near the west wall, the south end of which was about six inches from the north edge of the door between the two rooms, a kitchen cabinet on the south side of the room against the wall which formed the partition between the kitchen and the stairway and pantry, and a chair directly west of the cabinet. This was a white enameled kitchen cabinet about 42 inches long and 26 inches wide, to the height of 32 inches, where it divided into two parts, consisting of a table, about 15 inches wide, the length of the cabinet, and the cabinet part, about 11 inches wide, extending 35 inches higher.

Shortly after five o'clock the morning of the tragedy defendant went to the door of his mother's residence, pounded vigorously, and called to her and told her that Ida May had been accidentally shot, and asked her to come at once. She hurriedly threw on a robe and she and defendant started to his home. At sometime he made a remark to the effect that if she died he would kill himself. They spoke of the need to get a doctor. Mrs. Green went on to defendant's house and there found his wife lying on her back on the floor in the front room, her head near the front door, which was open. She was dead. Mrs. Green took a blanket off the davenport and covered her feet and legs and her body up to her waist, and ran to the nearby home of Alfred Miller for help, and Mr. and Mrs. Miller went to defendant's home. She or Mr. Miller also called the night watchman, George Hollens, and perhaps others, and Mrs. Green went back to defendant's house. In the meantime defendant had jumped into his car and driven a few blocks to the home of Doctor Stapp, knocked on his door and called to him and said his wife was shot, and asked the doctor to come. The doctor went to the door and told him he would go in his own car as soon as he was dressed. He did so and arrived at the house about 5:35 o'clock. He found defendant's wife lying on the floor on her back, with her head near the front door. She was dead. The doctor could not tell positively how long she had been dead; the body still was warm. He had her placed on the davenport, examined her and found the cause of death was a gunshot wound about the center of the abdomen, about two inches below the umbilicus. The size of the wound was about an inch and a quarter in diameter; the edges of the wound were ragged. The doctor called the coroner, who together with the sheriff and county attorney went to defendant's home, reaching there about seven o'clock in the morning.

When Doctor Stapp got there that morning defendant's mother, Mrs. Green, Mr. Hollens, Mr. Miller and his wife, were in the front room. Other persons were in the kitchen. Defendant was there, perhaps a part of the time outdoors. At Mrs. Green's request Mr. Hollens took charge of the shotgun, which he found lying on the kitchen floor five or six inches northeast of the northeast corner of the kitchen cabinet. There was a hot coffeepot over a burner of the oil stove. Someone—perhaps Mrs. Green—turned the burner out. There was a bowl heaped full of potatoes, peeled, and ready to be cooked, sitting on the table of the kitchen cabinet. Various witnesses estimated this to be of the height of five to seven inches.

After the coroner arrived the undertaker was called and the body of defendant's wife was taken to the mortuary and prepared for burial. An examination of the wound was made at the mortuary. No powder burns were observed about it. An autopsy disclosed that a charge from a shotgun had entered the body at the wound previously described; that there had been no scattering of the shot before they entered the body, but they appeared to scatter after entering the body. None of the shot had passed through the body. Six to nine of the shot, size No. 4, were found in the body. No effort was made to find all of them. From the location of those found it would appear that the force of the charge was inclined upward as it entered the body. The only other mark on her body was a bruise on the back of her left hand near the thumb. This appeared to have been made, not by a knife or sharp instrument, but by a blow, as with a board or stick.

When the county attorney, sheriff and coroner reached defendant's home shortly after seven o'clock the morning of the tragedy the coroner took charge of the body of the deceased and had it taken to the mortuary. The sheriff and county attorney took the names of several persons who were present and talked with them briefly and made some examination of the premises. George Hollens was there and gave the sawed-off shotgun to the sheriff. The county attorney had a brief talk with the defendant. Later they went to the mortuary and returned to defendant's home in Morrill about 1:30 o'clock that day. At that time the county attorney's stenographer was with them. The coroner took her there because he was planning to hold an inquest the next day. At that time they had a talk with the defendant, at which the county attorney asked him a number of questions, which he answered, and which questions and answers were taken by the stenographer. Answering questions as to what took place that morning and the day and evening before, defendant said they were starting to get breakfast that morning, his wife had put the coffeepot on, they heard some geese going over the house and his wife said, "There is some geese and we just as well have one," and he went to the kitchen and grabbed up the shotgun; that he reached in the pantry, which he spoke of as the closet; that the gun was in the northeast corner; that as he reached in there for it and picked it up, it went off while it was in his hand; that at the time his wife was standing in the door between the front room and kitchen, right by the gas stove; that the gun went off just as he picked it up; that he saw his wife was falling and ran and

grabbed her and dragged her to the front door, which he opened, and ran to call his mother, and then jumped in the car and went for the doctor; that on the day before he had gone to Sabetha with Art Roush, driving his car; he had had a couple of drinks in the afternoon, but outside of that he had no other drink; that he got back home from Sabetha about nine or ten o'clock and was home the rest of the night; that he and his wife went to bed about 10:00 or 10:30 o'clock. On being asked about trouble between him and his wife he said they got along better the last three months than they ever had; that they had got to know each other; that they never had any family arguments or quarrels, although sometimes they would get "mad"; that they had had no trouble the night before and went to bed friendly. Ordinarily he did not have the gun loaded when it was put away in the closet; he didn't know how it happened to be at that time. He estimated that he was six feet from his wife when the gun went off.

On the next day, November 14, an inquest was held. The coroner's jury made a return that defendant's wife came to her death by felonious intent from a gunshot wound at the hands of the defendant. Thereafter the county attorney had a warrant for his arrest issued, which was served on the 15th.

After defendant's arrest, and on March 16, the county attorney had him brought to his office and in the presence of the sheriff and one or two other persons questioned him further about his movements the afternoon and night previous to the tragedy, and of what took place that morning. His stenographer took this interview in the form of questions and answers. At this time defendant said that he and Art Roush did not go directly to Morrill from Sabetha, but that they went to St. Joseph, Mo., where they got some more whisky, ate their supper and put in some time, and drove back to Morrill through White Cloud; that he did not know what time he reached home, but somewhere from 10:00 o'clock in the evening to 2:00 o'clock in the morning; that his wife had not gone to bed, but was up waiting for him; that she greeted him affectionately, they visited a few minutes, then went to bed upstairs, and got up about five o'clock in the morning.

At the trial it developed from the testimony of Art Roush and others that in his talk with the officers defendant was far short of making a complete disclosure of his activities the afternoon and night prior to the tragedy. His escapade seems to have been

financed by Roush; he had $14 when they left Morrill about noon and $1.50 when they finally reached home. They went from Morrill to Sabetha, where they "fooled" around and drank whisky for two or three hours and then drove to St. Joseph, Mo., about sixty miles from Sabetha, reaching there about sundown. It was Sunday and the saloons were closed, but they hunted up a man on the street from whom they bought whisky. They ate their supper and then went down to the redlight district, where they spent the time with "the girls" until about 1:30 o'clock in the morning, when they started home. They drove off the road at a detour and got on the north river road and drove into White Cloud. There defendant saw a night watchman, told him they were lost and that they wanted to get to Morrill, and asked him what road to take and offered him a drink of whisky or gin. The night watchman declined the offer, but directed them to their road, and they drove out of town. The night watchman was careful to note the time of this incident and it was 2:25 o'clock in the morning. They were then forty miles or more from Morrill. They drove to Morrill through Falls City, Neb., which was several miles farther out of the way. Roush, a single man, was rooming at the home of Mrs. Cleland, two miles south of Morrill. She heard him come in and knew it was late in the morning. By her clock it was twenty-five minutes to four o'clock, but she testified her clock did not keep good time. "It wouldn't vary over an hour anyway." Defendant went from the Cleland place to his home in Morrill. Mr. Hollens, the night watchman at Morrill, who was on the street or about town all night, saw a car drive in from the south and toward defendant's home at 4:25 o'clock in the morning, hence the jury and trial court would be justified in believing that defendant had been at home not more than an hour when the tragedy occurred. Also, it seems reasonably clear that defendant's wife was up waiting for him when he came; that she had not retired to her bed upstairs, but probably had been sleeping on the davenport a part of the time, and that neither of them went to bed upstairs that night. Defendant's wife was anxious about him in the afternoon and evening before. About 2.30 o'clock in the afternoon, and again about 9:00 o'clock in the evening, she inquired of defendant's mother if she knew where he was, and who he was with, and appeared to be anxious about him. She also had inquired of one or two other persons whom she thought might know.

It is clear the sawed-off shotgun, previously mentioned, is the gun

from which the shot was fired which caused the death of Mrs. Criger. Defendant admitted that in his early talk with the officers, and it never has been questioned. While examining the premises soon after the tragedy the officers had found two shotgun shells in a drawer of the kitchen cabinet. These were loaded with No. 4 shot and a heavy charge of powder. Before the trial, and at one time while the trial was in progress, persons who had had considerable experience in the use of firearms made experiments by firing the gun at targets of blotting paper, using shells with the same load as those found in defendant's home. The purpose of the tests was to see over how large an area the shot would scatter when the gun was fired at varying distances from one to nine feet from the target. These tests tended to demonstrate that when the gun was nine feet from the target the pattern or spread of the shot was about five inches in diameter; when fired at six feet it was three and one-half inches; at three feet it was two and one-half inches, and when the gun was only one foot from the target the pattern was one and one-half inches. This tended to demonstrate that when the shot was fired which caused the death of defendant's wife the muzzle of the gun was approximately one foot from her body. We think there is ample evidence to sustain the verdict.

The jury would have been justified in discounting defendant's story that he got the gun out of the pantry for the purpose of shooting geese. The night watchman, who was still on duty at that time, heard no geese flying over that morning, but he did hear some one or two mornings previous to that. Under defendant's testimony the gun was good for shooting at game as close as twenty-five or thirty feet. The idea that he could get anything like that close to wild geese flying over is fantastic. No testimony of his, or on his behalf, disclosed that previous to that time he ever had hunted geese with this gun, or any other.

The evidence discloses defendant was quite a drinking man. On one occasion he had been sentenced to jail for sixty days for being drunk and disorderly. On another occasion, about two years before the tragedy, he had pleaded guilty at Falls City, Neb., to a charge of automobile theft and had been paroled for two years. There was testimony that on the fourth of July preceding the tragedy he and his wife went with another couple to Falls City, Neb., to see the fireworks. When they were ready to come home he was drinking and quarrelsome, and did not want to come. They finally got him

in the back seat with his wife, and the driver drove rapidly so he could not jump out. He quarreled with his wife, struck her, both with his open hand and with his fist, as many as half a dozen times. She had a black eye for several days as a result. He finally broke a glass in the window of the car, climbed out on the running board, raised the hood of the car, and cut off the gas so the car would stop.

Appellant correctly argues that evidence of bad character alone is not sufficient to convict of murder. He also correctly argues that doubt as to defendant's credibility is not alone sufficient to convict of murder, and that the improbability of the shooting occurring accidentally in the precise manner suggested by defendant is not sufficient. It is contended that the evidence is fatally defective for the lack of evidence tending to show that the shooting was intentional and could not have occurred accidentally. We think the evidence ample to meet this test.

The same point is argued by appellant in support of his contention that the court erred in denying his motion to discharge the defendant on the opening statement of the county attorney, and the same argument is made in support of appellant's contention that the court erred in denying his motion to discharge at the close of the state's evidence. We think both the opening statement and the evidence on the part of the state contained facts from which the jury might justly conclude that the shooting was intentional rather than accidental.

We turn now to the questions argued on behalf of appellant respecting the admission of evidence. It is argued that the testimony of witnesses respecting their conversations with defendant had with him after his arrest was incompetent by reason of the fact that defendant was not specifically told of his constitutional right and was not at the time represented by counsel. Apparently this refers to the transaction of March 16. The trial court ruled that the test as to the admissibility of the evidence was whether the statements were voluntarily made by the defendant. There is no contention they were not so made. We think the ruling correct. In *State v. Inman*, 70 Kan. 894, 79 Pac. 162, in a *per curiam* opinion, it was said:

"The contention that the admission in evidence of statements made out of court by a party on trial are incompetent, on the theory that they tend to make him a witness against himself, is without substance. Voluntary statements of an accused person have always been received in evidence against him. Section 10 of the bill of rights is not violated by the admission of such testimony." (p. 894.)

See, also, 16 C. J. 626, 628; 30 C. J. 299; *State v. Sorter,* 52 Kan. 531, 539, 34 Pac. 1036; *State v. Castigno,* 71 Kan. 851, 80 Pac. 630; *State v. Jackett,* 85 Kan. 427, 116 Pac. 509; *State v. Dilgar,* 111 Kan. 794, 208 Pac. 620; *State v. Messmer,* 123 Kan. 201, 254 Pac. 378; *State v. Harding,* 142 Kan. 347, 46 P. 2d 617.

It next is argued that the testimony of various witnesses for the state as to the movements of defendant in the afternoon and night of March 12 and the morning of March 13, not directly connected with the shooting of deceased, was error. We think this testimony is competent. (See, *State v. King,* 111 Kan. 140, 144, 206 Pac. 883; *State v. Netherton,* 133 Kan. 685, 3 P. 2d 495, and *State v. O'Neal,* 150 Kan. 76, 91 P. 2d 12.)

Next it is argued that the testimony of various witnesses concerning remote altercations between defendant and his wife, not connected directly with the shooting of deceased, and where the trouble between them was not shown to have continued to that time, or had any direct relation thereto, was incompetent and erroneous. The testimony respecting the transaction on July 4 preceding the tragedy was offered in rebuttal and after defendant had testified that he and his wife had never had any serious trouble. There was no error of the court in the admission of this evidence.

It is argued that the testimony of various witnesses as to the results of experiments conducted by them in shooting the sawed-off shotgun at various distances, not made under the supervision of the court or in the presence of defendant, and not shown to have been made under conditions substantially similar to those under which the gun was fired at the time of the tragedy, was incompetent and erroneously received. Experiments of this character frequently are made in homicide cases, and uniformly received in evidence. The purpose of the experiments in this case was to determine the spread or pattern of the shot when the gun was fired at various distances from the target. There is no reason to think that the spread or pattern of the shot would be different when the gun was fired at the time of the tragedy than when the experiments were being made. We think there was no error in the admission of this testimony. In this connection it also was argued that it was error for the court to admit in evidence the targets used in these experiments, which showed the spread or pattern of the shot when the gun was fired at various distances from the target. If the testimony respecting these experiments was competent there was no reason to exclude the targets.

Defendant had stated before the trial of the case to various witnesses just how he picked up the shotgun out of the pantry, how he turned where he was standing when the gun went off, and where his wife was then standing. Several witnesses who testified for the state had gone to the home of the defendant and had experimented by going through the movements as defendant had described what he did. The defense in this case was that the gun was accidentally discharged as defendant took it out of the pantry, and one of the theories advanced was that as defendant took the gun out of the pantry, having stooped over to do so, as he straightened up and turned to the right that the hammer of the gun struck against the higher portion of the kitchen cabinet in such a way as to cause the gun to be discharged. Briefly stated, the testimony of those who conducted the experiments was that if the hammer of the gun had struck the kitchen cabinet the barrel of the gun would have been in such a position that necessarily the shot would have gone to the north of the place where defendant's wife was said to have been standing in the door and would have missed her entirely; or, in any event, would have had to be higher than the bowl of potatoes sitting on the table part of the kitchen cabinet, and that this was several inches higher than the wound on the body of the deceased, and in which event the shot would have ranged downward instead of upward; that had defendant stepped back to the north as he took the gun out of the pantry and before he turned to the right, so that the kitchen cabinet would not have been in the range between him and the door where he said his wife was standing, then the hammer could not have caught on the cabinet. We think this evidence was competent to be received under the rule respecting the admission of evidence of experiments. Its weight or probative value was, of course, for the jury.

We take note of the fact that no objection was made to the instructions of the court. They are not even included in the abstract. We must assume, therefore, that the trial court correctly instructed the jury as to their duty in weighing and considering the various classes or types of evidence permitted to be received.

Appellant contends the court erred in overruling his motion for a new trial. In addition to the matters hereinbefore discussed, presented to the court at that time, defendant called the sheriff as a witness, who testified that when inspecting the premises soon after the tragedy he observed a certain mark on the east end of the higher

portion of the kitchen cabinet; that he had examined this with a magnifying glass, which enabled him to see it better than he could with his naked eye; that this mark was about ten and three-fourths inches above the table of the cabinet, about an inch in width at the top, extending diagonally downward to the corner of the cabinet, where there was a small piece chipped off the cabinet; that the mark looked as if it had been made with something rough, which had scratched down that corner of the cabinet. This particular mark had been testified to by several witnesses in the trial of the case in chief. This witness had testified to the examinations he made, although he had not testified to having examined this mark with a magnifying glass. In fact, the witnesses testified to two or three marks or scratches on that end of the cabinet. Under directions of the court the jury had examined the premises, and very likely they had examined the marks on the cabinet testified to by the witnesses. The trial court was of the opinion that there was nothing particularly new in this evidence, that there was no reason to believe that it would produce a different result, and that it was not sufficient to justify the granting of a new trial. We agree with the trial court in these views.

We find no material error in the record. The judgment of the court below is affirmed.