No. 41,643

STATE OF KANSAS, *Appellee*, v. JAMES JACOB STUBBS, *Appellant*.

(349 P. 2d 936)

Opinion filed March 5, 1960.

Appellant was on the briefs *pro se*.

*Loyd H. Phillips*, county attorney, argued the cause, and *Jerry L. Griffith*, assistant county attorney, was with him on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: Defendant was formally charged and tried by a jury whereby he was convicted of the commission of the crime of murder in the second degree. (G. S. 1949, 21-402.) Defendant moved for new trial and the motion was overruled. The trial court entered judgment and upon the county attorney's pleading two previous felony convictions, the trial court, pursuant to the habitual criminal statute (G. S. 1949, 21-107a), sentenced defendant to a term of sixty years. Defendant appeals from the verdict of the jury, the order overruling his motion for new trial, and the judgment and sentence of the trial court.

On September 8, 1958, defendant was brought before the district court of the twentieth judicial district in Barton county and upon the county attorney's application, Richard C. McGrath and Warren W. Wagoner were appointed to represent him on a complaint charging him with commission of the crime of second degree murder. Thereafter preliminary hearing was waived. On December 8, 1958, upon defendant's expression of dissatisfaction with Mr. Wagoner and on request for a replacement, Wagoner was removed and the trial court appointed Robert E. Southern, a former Barton county attorney, as co-counsel with McGrath.

On December 15, 1958, trial began upon the information charging defendant with murder in the second degree in violation of G. S. 1949, 21-402. Defendant waived arraignment and entered a plea of "not guilty." Thirteen jurors, one an alternate by pretrial agreement of counsel in open court, were impaneled and sworn to try the cause.

C. L. Wegele, the state's first witness, identified defendant as the man who, on September 5, 1958, at approximately 12:30 a. m. had flagged him at the intersection one mile south of Hoisington on U. S. highway 281 and he had stopped and picked defendant up. Defendant had no shirt on and had "mud, blood and stuff on his face and body." Wegele noticed the knife in defendant's hand (the record shows it was admittedly the murder weapon) and upon Wegele's request, he gave the knife to Wegele who laid it on the floor boards on the driver's side of the car. Defendant told Wegele not to finger the knife too much. Wegele noticed blood on the blade when he delivered the knife to officer Nettlingham in Hoisington.

Nettlingham testified that as defendant got out of Wegele's car, he asked Nettlingham if he knew Mr. Carl Harned, the deceased victim, and Nettlingham answered that he did. Nettlingham sealed the knife in a manila envelope and later turned it over to Vance H. Houdyshell of the Kansas Bureau of Investigation. Defendant told Nettlingham that Harned was "out to the farm dead"; defendant was not sure what had happened but he had come to with this knife in his hand; Harned was cut up and there was blood all over the place; Harned did not have a sign of pulse and he knew Harned was dead; he remembered that he and Harned had walked through a door and someone hit him but it was not Harned; next thing he knew he came to with the knife in his hand, lying beside Harned covered with blood; defendant kept asking himself and Nettlingham,

"How could I do that to a friend of mine, an old man like that?" Defendant had a knot and cut above his right eye, his face was bloody, his hands were covered with blood, a considerable amount of blood and mud was on his trousers, and some spots of blood were on his undershirt.

Luther Tindall, deputy sheriff, testified he asked defendant what happened and he answered, "I cut a man's throat . . . Carl Harned, do you know him?" Tindall said, "Yes." Defendant said Harned was dead because there was no pulse and he must have done it because he was the only one there. Tindall and the sheriff went to Harned's home where they found Harned's body and on the back of a chair hung defendant's shirt, which was later identified by defendant. On cross-examination Tindall stated defendant told him he had cut a man's throat; that he did not see how he could have but he was the only one there.

Coroner L. R. McGill said Harned's jugular vein on the left side was severed in two places by two cuts an inch apart which had caused his death about two hours previously. There was a fatal stab wound on the left side of the chest wall and two or three cuts in the back. These were in addition to a large cut on the left shoulder blade. This testimony was substantially corroborated by Ted C. Burgat, the mortician, except that there were three instead of two cuts and severances of the jugular vein on the left side.

Doctor William R. Evans, with their written consent, took blood samples from both defendant and his wife, and Vance H. Houdyshell took a sample from the deceased. Houdyshell further corroborated the testimony of the officers previously testifying, identified the knife as a skinning knife, and in addition, stated that defendant could remember that his wife had struck him with a jack handle or tire iron but as to subsequent happenings, he was confused and wanted more time to think it over. Later defendant told the county attorney and Houdyshell that while he was sitting in a chair, Harned had put his finger in defendant's face or slapped defendant. He had told Harned not to do it again but Harned did and he (defendant) must have reached over on the table, picked up the knife, and took a cut at Harned's throat. The blood flew, there was a gurgling noise, and Harned stumbled and fell. Defendant stated he could have cut Harned one or fifty times. He had been taught and had acquired a habit of fighting with a knife with either hand since he was twelve years old. In Kansas City he had had a drunken knife

fight with a drinking buddy, and in Great Bend had gotten a bang out of beating a Mr. Ozbun and watching him jump up and run when the fight was stopped by somebody turning on a porch light. When they went to the Harned home, defendant showed Griffith, Phillips, Tindall, and Houdyshell the chair in which he was sitting, or by which he was standing, when Harned slapped him. There was no doubt he must have reached on the table, picked up the knife and taken a cut at Harned's throat. Defendant had gone over and lay down four or five feet from Harned's body and when he came to he noticed the knife in his (defendant's) right hand. He was ready to make a statement, which was given on September 6, 1958, at 11:45 a. m. The statement was signed by defendant and witnessed by Houdyshell and Phillips at 4:30 p. m. the same day.

The statement was marked as exhibit 23 and offered. Southern objected thereto. The trial court excused the jury and after a lengthy colloquy with counsel, admitted the statement. It was then read to the jury. The signed statement is lengthy and summarizing it would add little, if anything, that would be pertinent hereto. However, it may be mentioned the statement included more detail as to Mrs. Stubb's connection with, and the activities leading up to, defendant's being hit, being slapped by Harned, and the ultimate cutting of Harned, which resulted in his death.

Because of the inability of Peter G. Duncan, special agent for the Federal Bureau of Investigation to be present and testify, during the state's presentation of its evidence and over the objection of defense counsel, the trial court recessed from 5:00 p. m. on December 15, 1958, until 9:00 a. m. on December 17, 1958.

A medical technologist in charge of the Forbes Air Force Base Hospital at Topeka testified that the sample of Harned's blood showed it was group B type, that defendant's was group O, and his wife's was group A.

Duncan stated that he found human blood from group B on both sides of the knife blade. The blood stains on defendant's trousers were all human and came from groups O and B. On defendant's undershirt there were also human blood stains belonging to group B, caused by contact, and group O, caused by dropping. There were human blood stains on both the front and back of the dress of defendant's wife but they all belonged to group O without variance.

At this time the defense lodged a demurrer to the evidence of the state and the trial court, after correctly summarizing the evidence offered by the state, overruled the demurrer.

The defendant testified in his own behalf. He was an ex-convict and knew he would be charged with murder; he had been careful with the knife; he had told Nettlingham that he was the only person there; that he could not have killed Harned but he was the only one there; Nettlingham had told him not to clean up until someone got there; defendant admitted that in 1934 he had been convicted of larceny and sentenced to two years in the Missouri Intermediate Reformatory and in 1938 he was convicted of burglary and larceny and sentenced to four years in the Missouri State Penitentiary; he told about the Clarence Ozbun affair in Great Bend which will not be repeated; when asked if he thought he had killed Harned, he said he did not know, he did not believe he had but could not positively state that he had not killed him.

On cross-examination defendant admitted that in answer to their question, "Was there anyone else there?", he had told the county attorney and Houdyshell that only he and his wife were there; he then stated they threatened him that they were going to file a second degree murder charge against his wife if he did not tell them a story they liked; he had made and executed the written statement; his testimony then went to his use of a knife since he was eleven or twelve years of age and he stated that about eighteen months prior, he had used a knife on a man in Kansas City; defendant's brother had stopped him but was afraid of defendant; he knew defendant did not like "no one fooling" with him, and had not pulled him off the man; defendant remembered asking his wife for his car keys, that she hit him with something, and he pushed her face down in the mud, as he had done on one previous occasion; when asked if her daughter had pulled him off, he again stated that *no one or nobody* pulled him off; there was other testimony about the signed statement not being true all the way through, but defendant finally admitted that the county attorney had handed him his fountain pen so he could make any changes he desired as he read through the statement; no changes were made; he knew his constitutional rights and identified the signature on the statement as his own.

The state recalled Houdyshell as a rebuttal witness. He denied that defendant had been told he had to give a story they liked

and if he did not, his wife would be charged with second degree murder.

After conviction, as heretofore stated, the defense filed a motion for new trial which was overruled and defendant was sentenced by reason of the two previous Missouri felony convictions (G. S. 1949, 21-107a) to a term of sixty years in the Kansas State Penitentiary.

As is obvious from this record, defendant was furnished with very capable counsel who made timely objections to and tested every bit of evidence offered by the state. The county attorney and trial court went beyond the usual requirements in a criminal prosecution to afford defendant every possible consideration for and guarantee of a fair trial. This attitude is extended to this appeal because the county attorney has carefully and fairly briefed each of defendant's contentions.

We shall consider and discuss defendant's contentions in the order in which he lists them. The first claim of error is the trial court's continuing the case, during the presentation of the state's evidence, from Monday evening to Wednesday morning and allowing the jury to separate. The record shows the jury was properly and fully admonished, and since such matters are discretionary with the trial court, unless it is shown there was an abuse of that discretion amounting to prejudice, the judgment will not be reversed. (G. S. 1949, 62-1446; *State v. Howland,* 157 Kan. 11, 17, 138 P. 2d 424.)

Next, local papers, radio and television contained prejudicial stories and pictures which were sure to come to the jurors' attention and would tend to influence their decision, but these matters were not presented in the motion for new trial and will not be considered on appeal. (*State v. Haught,* 180 Kan. 96, 299 P. 2d 573.) For the same reason, defendant's third contention cannot be considered.

In view of the pertinent evidence narrated herein the contention the verdict was contrary to the evidence is patently without merit, as is a later claim that the trial court erred in overruling defendant's demurrer. Not only was there prima facie evidence but there was also ample, substantial, and uncontradicted evidence to support the verdict of the jury and the trial court's order overruling the demurrer to the state's evidence. The appropriate controlling rule on this point is also stated in the Haught case, *supra,* and need not be repeated here.

On this record we can find no merit in defendant's next complaint that no fingerprints were taken from the knife. Houdyshell would have had to sacrifice determination of the blood type to obtain fingerprints, and there was no evidence whatever that anyone else had used the knife or, more especially, that it had been used by anyone else in the manner in which defendant had used it.

Regarding the contention as to motive, although the defendant apparently meant intent, this is a second degree murder prosecution and we have already answered this contention by the evidence herein set forth. Motive is discussed in *State v. Crosby,* 182 Kan. 677, 685, 324 P. 2d 197, where it is stated that motive is a matter of evidence to be considered by the jury and if, without proof of a motive, the evidence is sufficient to satisfy the jury of defendant's guilt beyond a reasonable doubt, no motive need be shown. It should also be noted that the full instructions of the trial court were not in the abstract of this record and, under *State v. Criger,* 151 Kan. 176, 185, 98 P. 2d 133, we assume the jury was properly and fully instructed.

Defendant complains that the statement he made and executed on September 6, 1958, was obtained under duress, was not a confession, and should not have been admitted. A plain and simple answer to this is that the trial court, as related herein, was very careful to excuse the jury and determine whether the statement was freely and voluntarily made before admitting it for the jury's consideration, all of which is in conformity with the rule laid down in *State v. Seward,* 163 Kan. 136, 145, 181 P. 2d 478, where it was further stated that when admitted, the credibility of the statement was a question for the jury. Similar to the statements made in *State v. Vargas,* 180 Kan. 716, 718, 308 P. 2d 81, the written statement here was just an enlargement of voluntary statements against interest made by the defendant to the witnesses for the state. It was properly admitted.

We do not approve of the deputy county attorney's overzealous statements to the effect that defendant's wife did not testify because she would have to testify against him; that defendant was a psychopathic killer; and who will be number five? (*State v. Peterson,* 102 Kan. 900, 171 Pac. 1153.) Defendant's wife was in the courtroom and her testimony was available to the defendant at any time. Here again we are unable to tell from the record whether the trial court instructed on this matter, or whether defendant reg-

istered an objection, and the only possible determination for this court to make on this issue is that the record does not support defendant's contention.

We have already noted that defendant had capable counsel and a full, fair and adequate trial and we shall, therefore, pass his complaint as to that. We shall also pass the succeeding one as to sentence because G. S. 1949, 62-1516 and 21-107a are not inconsistent or repugnant but, on the contrary, the former provides the manner in which the trial court shall set out the previous conviction, or convictions, whereby 21-107a becomes operative and applicable.

The pictures taken at the scene and admitted in evidence by the trial court were not prejudicial. (*State v. Lytle*, 177 Kan. 408, 411, 412, 280 P. 2d 924.)

We conclude the trial court properly overruled defendant's motion for new trial and properly sentenced defendant under G. S. 1949, 21-107a, and further conclude that defendant has totally failed to make it affirmatively appear there was error which prejudicially affected his substantial rights.

The judgment and sentence of the trial court must be affirmed. So ordered.