No. 44,032

STATE OF KANSAS, *Appellee*, v. C. K. CLARK, *Appellant*.

(398 P. 2d 327)

Opinion filed January 23, 1965.

*Charles A. Walsh*, of Concordia, argued the cause and *Percy H. Collins, Jr.*, of Belleville, and *William J. Walsh*, of Concordia, were with him on the brief for the appellant.

*Frank G. Spurney, Jr.*, county attorney, argued the cause, and *William M. Ferguson*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

ROBB, J.: Defendant appeals from the trial court's judgment and order based on the jury's verdict of guilty of murder in the first degree with penalty affixed by the jury at life imprisonment under G. S. 1949, 21-403, from adverse rulings of the trial court during the selection of the jury, from failure of the court properly to instruct the jury, and from all adverse rulings including the order overruling the motion for new trial.

For many years defendant had been an employee of the Rock Island Railroad Company and was well known in Belleville, Kansas. On October 10, 1963, the fatal day in question, defendant did not work. He attended a safety meeting, which lasted some forty minutes, and then drove out to the east part of Belleville to do some practice shooting with his small caliber pistol. He intended to lock the pistol in the glove compartment of his car where he usually kept it. En route to his car he put the pistol in his pocket to keep from alarming a passing woman driver and forgot to take it out of his pocket. He drove to downtown Belleville. He went to Mac's Recreation Parlor where he was going to

engage in a pool game with a friend and when he entered the building he realized the pistol was still in his pocket. He played pool for some time and around 6:00 p. m. went to Henry's Tavern, had a sandwich, and drank a glass of beer. He gave fifty cents to a young woman, and from the proceeds thereof she and her young companions played some additional records on the music machine, and then the group of young people left. Defendant left Henry's Tavern and started to go home. As he went by Riley's Recreation Parlor, he looked in and saw the proprietor, Bill Riley, which was unusual. According to Riley's own testimony, this was the first time in three years he had worked at night. Riley introduced defendant to Amos J. Huffman, the deceased. Defendant and the deceased talked a little bit and drank some beer. Defendant saw the young woman he had given the fifty cents to come in and defendant asked her what had become of his music. She made some remarks and then went to the back of the room and in a few minutes came back and laid thirty-five cents down on the counter. Defendant told her he did not want the money, he was just kidding, and she took the thirty-five cents and went to the back of the room. Her male companion later came up and threw down fifty cents on the counter and told defendant, "There's your money."

Defendant was annoyed and embarrassed and talked pretty rough to the youngsters. Deceased generally butted in to the conversation and told defendant he should not talk to the youngsters that way. Defendant told deceased it was none of his business and deceased told defendant he was making it his business and would give defendant the beating of his life. The argument became loud with cursing and other vulgar expressions until Riley, the manager, separated them. This argument was around 8:30 p. m.

Defendant went back and sat down at the side of the pool hall. Huffman went up and sat on the second stool towards the front of the bar. Defendant had told deceased he was a sick man and would not go outside to fight deceased. Deceased told at least two witnesses he was going to whip defendant before he went home. About 9:00 p. m. defendant told the witness, Richard Milner, he was going to shoot deceased if he did not leave him alone. He said he was going to aim at deceased's thigh if he did not leave him alone. Defendant stated that because of his physical condition he could not pick up a ten pound bag of sugar. Riley told defendant he wouldn't shoot anybody, which ended the conversation.

During a conversation with a witness, Ronald Leroy Jones, defendant produced the small pistol and made a statement to the effect that if deceased did not leave him alone and get off his back, he was going to "put some holes into him," or something to that effect. The witness Jones testified Jack Milner was standing there by him at the time. Defendant stated his health was poor and he was in no condition to withstand a beating.

Another witness, William, King, arrived on the scene about 8:30 p. m. He stated he did not know there had been a real argument between the two men. Deceased asked him who the "loud mouth" was and King told him that was just Casey's (defendant's) way. King also told deceased he worked with defendant and defendant "like a lot of us" had a temper.

Defendant told King he was going to hit deceased over the head with a beer bottle and he (King) might have to "take it up from there." Defendant complained to King that deceased had called him an "S. O. B." Defendant said he would have to shoot deceased down to the size of a three year old, and he "pulled a revolver from his pocket" according to the witness.

The record further discloses that defendant was fifty-four years old, more than six feet tall, and weighed only 134 pounds. Huffman, the deceased, was about forty-six years of age, six feet tall, and weighed nearly 200 pounds. Defendant was in poor health and had had three abdominal operations.

About 10:00 p. m. defendant decided to leave to go home but changed his mind and decided to get his pool cue and go next door to Mac's and play a game. His pool cue, which was jointed, had been made for him personally, and was in a cabinet that Mr. Riley had on the east side of the pool room. The cue was in a cardboard carton and as defendant took it out of the cabinet, deceased noticed him and got up from the stool where he had been sitting, got right in front of defendant and began to back him out of the pool hall. The evidence is uncontradicted that defendant kept telling deceased to leave him alone, that in his condition defendant was not able to fight, but deceased continued to back defendant out of the pool hall. When the two men were barely out of sight of the witnesses in the pool hall, gun shots were heard and deceased backed up to the door and started in the door and collapsed in the pool hall. Defendant had emptied his pistol but stood over deceased and struck him once with the case containing

his pool cue. All patrons of the pool hall had gone out the back door except the witnesses, Robert Charles Woods and Riley. As Riley moved toward the door, he said, "My God Casey, what have you done?" Defendant answered, "I shot the son-of-a-bitch."

The autopsy conducted by two qualified doctors showed five small caliber pistol bullets had entered deceased's body and the cause of death was gun shot wounds through vital organs in the chest.

The sheriff and his deputies arrested defendant at his trailer home a short time after the shooting. Defendant is a married man with three children.

Particular attention is called to the fact that defendant was represented, and we think well represented, at each and every step of the proceedings by a good, capable lawyer who has practiced law for many years. He presented defendant's defense in an excellent and professional manner and did everything he could to see that defendant's rights were fully protected.

At the beginning 183 prospective jurors were examined and it appeared for a time it was going to be impossible to get twelve competent jurors to try the cause. Defendant's counsel suggested that if they could abandon the case at that time, he would like to ask for a change of venue and that the state reduce the charge so the defendant could be released on bond. He further stated that Republic county is a small county, that the number of available talesmen was limited and practically everyone, except those who were absent from the county at the time, had read the inflammatory articles in the newspapers. It seemed defendant's counsel wanted the venue changed to Cloud county, his home county. The state objected to any ruling of the court until a formal motion for change of venue had been filed. According to the trial court, fifteen jurors had actually qualified by that time and the court saw no reason why it could not summon additional prospective jurors. The evidence was not sufficient to convince the trial court a change of venue was necessary.

When the number of jurors had reached twenty-six the state made an offer to relinquish ten of its challenges, leaving twelve challenges for the defense, and defendant moved to strike eight of the *venire* because their testimony showed they could not sit as fair and impartial jurors. While no formal motions were ever filed pertaining to the change of venue or selection of the jury, the trial court neverthless overruled them.

Obviously, the foregoing factual statement is quite lengthy, but we think in a prosecution for a capital offense the full circumstances of the case should be presented in the written opinion of this court.

The trial court gave forty-four instructions. Defendant objected to instruction No. 7 because deliberation and premeditation have no evidence to support them, but the record reflects contrarywise. Defendant objected to instruction No. 11 because of the inclusion of the charge of murder in the first degree but we think the record makes the charge of murder in the first degree necessary and proper where it is shown that defendant took a loaded pistol out of his pocket at a range of a few feet and shot five leaden bullets into the mid-section of deceased's body. The instruction thereupon was also proper.

Instruction No. 13, also objected to by defendant, was proper under the record and needs no particular discussion. The same is true of instruction No. 18 setting out the various degrees of manslaughter. While it may not have been necessary that an instruction be given thereon, we are unable to say that the giving thereof was reversible error. In view of the above, we think it unnecessary to cover the objection to instruction No. 30 which included first and second degree murder as well as the various degrees of manslaughter. Instruction No. 32 on the punishment for conviction of first degree murder was proper since we have already stated the instruction on first degree murder was proper.

The reasons set forth by the trial court when it overruled defendant's motion for requested instructions appear to have been sufficient and the ruling was, therefore, correct.

This court has long been committed to the rule that it is the exclusive function of the jury, not that of the court on appellate review, to weigh the evidence and pass upon the credibility of witnesses, and that were there is any substantial, competent evidence to support the verdict, it will not be disturbed on grounds of insufficiency of the evidence. (*State v. Osburn,* 171 Kan. 330, 332, 232 P. 2d 451, and cases cited therein; *State v. Haught,* 180 Kan. 96, 100, 299 P. 2d 573; *State v. Stubbs,* 186 Kan. 266, 271, 349 P. 2d 936.)

We should perhaps pause here to point out to the prosecution that the citations of authority in its brief include only the volume and page number of our Kansas Reports. It is most helpful to this court, and has been the custom for many years, to include at least the citations from the Pacific Reporter system.

We have studiously examined the entire record in this case, but we are unable to say defendant has made it affirmatively appear that his substantial rights have been prejudically affected. The record reflects that he had a full, complete, fair, and impartial trial, that he had very able and astute counsel, and that the trial court saw that every complaint made by defendant's counsel was carefully considered and ruled upon. We, therefore, hold the trial court did not err in any of the particulars complained of and its judgment should be affirmed.

Judgment affirmed.