No. 39,820

STATE OF KANSAS, *Appellee,* v. ROBERT ROLAND STEWART, *Appellant.*

(296 P. 2d 1071)

Opinion filed May 5, 1956.

*W. H. Coutts, Jr.,* of El Dorado, argued the cause and was on the briefs for the appellant.

*Morris Moon,* special county attorney, argued the cause, and *Harold R. Fatzer,* attorney general, and *Robert M. King,* county attorney, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Robb, J.: This is a criminal prosecution wherein the defendant was charged with murder in the first degree and was convicted of murder in the second degree, from which conviction defendant appeals.

The record in the case, the trial of which took a week, has been condensed by counsel to a great extent. We will summarize the facts and record even more so as to avoid making this opinion any more voluminous than is necessary and yet present all issues clearly.

At the outset we wish to state that the specifications of error in this appeal do not appear in appellant's abstract as provided by rule 5 of this court, as follows,

"The appellant's abstract shall include a specification of the errors complained of, separately set forth and numbered . . .,"

but they appear only in appellant's brief. In this instance we will not consider this as fatal to the appeal.

Before setting out the factual summary, we will dispose of a chal-

lenge to certain of the specifications of error. Appellee requests the dismissal of the first, second, third and sixth specifications of error for the reason they were not raised on the hearing of the motion for new trial. Without encumbering the opinion with repetition of those specifications, we believe the objection is good since appellee's reason is borne out by the record before us. This rule of law was stated in *State v. McManaman,* 175 Kan. 33, 258 P. 2d 997,

"Specifications of error not included in the grounds of a motion for a new trial and called to the trial court's attention cannot be considered on an appeal from a conviction in a criminal action." (Syl. ¶ 1.)

This disposes of the necessity for any further treatment of the numbered questions. The remaining ten specifications of error will be considered after the following factual summary.

Appellant, Robert Roland Stewart, a twenty-four-year-old navy veteran who had served in Guam and the Marianas, had been a patrolman in the police department of the city of Wichita from December 16, 1953, until about June 26, 1954. He had met Elsie Winifred Nan Dehay Warner in the middle of November, 1953, and they kept steady company thereafter. He had become a partner in her printing establishment for which he had given her father his note in the sum of $8,500. In his police duties Stewart was required to carry a .45 caliber gun at all times and Nan had always carried a .32 (Savage) automatic pistol in her purse because of fear of her divorced husband and brother-in-law, who had threatened her. Nan was thirty-five years of age, about five and one-half feet tall, weighed approximately 135 pounds, was strong for a woman, and had been married twice. Stewart was in love with Nan and had never at any time threatened her life. They had lived in the same house and had planned to marry, but Stewart's parents objected to the marriage because of the difference in ages and because Nan was a divorcee while he was a bachelor.

On the night of June 26, 1954, Stewart and Nan, while en route to a drive-in theater, stopped at a liquor store and purchased twenty-four cans of Gluek's Stite beer which they iced six cans at a time in a small ice cooler in Stewart's Mercury car. During the night and early morning they jointly consumed all the beer. In the early hours of June 27, 1954, they drove to Santa Fe lake but found it crowded and unsuitable for swimming and they started to El Dorado lake. Nan was dressed in a sun dress and Stewart wore a print

sport shirt. His hair was cut short to about one-fourth or one-half inch.

Betty Julius, a witness who figures in a specification of error, had testified that she had been in a car within five or ten feet next to and on the left side of Stewart's Mercury at a drive-in cafe. She could not identify Nan but she did undertake to identify Stewart by saying she saw his profile, saw that he wore a short-sleeved, light-colored shirt and as he moved into the driver's seat, where Nan had been sitting, she saw the front of his face. Her attention was attracted by an argument over something Nan could not eat, which was followed by a statement by Nan, "What do you want to murder her for?" This took place about 10:30 p. m. in the Riverside Rainbow drive-in cafe across the street from the drive-in theater attended by Stewart and Nan. Stewart denied ever having been in such eating place and further stated that the only food consumed was two hot dogs obtained by Nan during their stay at the theater.

Stewart's testimony disclosed: Along the road to El Dorado lake Nan objected to Stewart's speed. He slammed on the brakes, which threw both of them severely forward, and stopped the car partially "crossways" of the road, as shown by skid marks in the state's evidence. He backed the car slightly, started forward, and then Nan said, "Damn you, Bob." She grabbed Stewart's gun from between the seats. Stewart grabbed for it and they wrestled for the gun. Stewart next heard an explosion of the gun going off and then saw it lying on the seat covered with blood. Nan was on her side of the car with her head back and was bleeding quite profusely from a large wound. Stewart probed the wound with his finger to determine the direction the bullet had traveled and to endeavor to stop any flow of blood. He tested her pulse and determined that she was still alive. He immediately started for El Dorado hospital. At Towanda he made another testing of her pulse and found her dead. He made a U-turn and headed back west. He wanted to commit suicide but couldn't muster up enough courage. He continued to drive around (after his arrest and transfer to the El Dorado county jail he retraced his meanderings with one of the officers) and to bolster his courage for suicidal purposes he shot his gun through the car window. (This shot came close to a passing motorist, who reported it to a deputy sheriff at Winfield. The sheriff took him to Augusta where he saw Stewart.) Sometime during the

morning Stewart placed Nan's body in the trunk of the car and proceeded to drive aimlessly around.

Just before 8:00 a. m. Stewart's Mercury collided with a pick-up truck in or close to the south part of Augusta. The first person there testified that the Mercury had turned over and pinned Stewart between the back of the front seat and the top. With the help of others, the car was turned onto its right side and Stewart, unconscious and gasping for breath, was lowered to the lower side so he would not fall. In reply to a question, he stated his girl friend was in the car but a search for her proved futile. Stewart then stated he was running from a dope ring and had killed the woman he loved. A trickle of blood from the trunk of the car attracted attention and the trunk lid was pried open and Nan's body clad in a bathing suit was revealed. Debris and some full cans of beer were picked up and in response to a request by Stewart, a witness gave him a cigarette, which he smoked. A little later when a state patrolman arrived at the scene Stewart was still in the car jumping back and forth between the front and back seats, digging through things in the car, and he refused, upon request, to talk to anyone less than a sergeant. He cursed the patrolman. He stated that the person in the car trunk was his girl friend and he finally came out of the vehicle voluntarily. Stewart's billfold and police badge fell out of the car. During a later conversation with this patrolman in the Augusta jail, Stewart repeated many times that he could not live with "this" on his conscience, he wanted the death penalty, he wanted to get it over as soon as possible, and he wanted to go to court the next day and plead guilty. Practically the same statements were made in the county attorney's office after his removal to the county jail at El Dorado. There was a strong odor on his breath denoting that he had been drinking and he was very much under some form of intoxicating liquor. He had cuts and abrasions on his right elbow, on both hands, both sides of his face and forehead, and there was blood in his hair. Stewart was in some degree of shock. One witness said that Stewart was in a coma or stupor and could not orient himself most of the time at the accident. Stewart had said to this witness,

"You know how it is, you are a police officer, you probably have to carry your gun while off-duty too. You know how it is. She was 11 years older than I am."

Stewart repeatedly asked this witness for a cigarette and he was smoking one at the time. Stewart did not, when he was asked to, give the witness the burning cigarette even though there was gasoline running underneath him from a leak in the tank.

At the time Stewart claimed he did not remember anything that happened very clearly as late as Monday, June 28, 1954. It was contended by his counsel that he was intoxicated and doped but there is nothing in the record about dope except Stewart's statement at the scene of the accident, "I am running from a dope ring." This statement was before the jury but its probative value is questionable in view of Stewart's endeavor to devalue all his other statements made at the scene of the car accident and within a period of forty-eight to sixty hours' time thereafter.

There were a number of witnesses used for the purpose of ballistics, photographic, and medical evidence but we will mention only the germane portions of that testimony.

A number of photographs in black and white and in color were taken at different times both before and after Stewart was in jail. One witness took a picture, which was abstracted into the record here, showing Stewart, apparently in an unconscious condition, being pulled or dragged along between two officers. On cross-examination this witness testified he saw the apparent voluntary going down of Stewart, thought it material and snapped the picture. The state endeavored to show slides on a screen. The trial court admitted the slides and ruled out the screen on objection by Stewart's counsel.

A doctor established the entry point of the fatal bullet was one and one half inches to the right of the midline of the back of the neck and about one quarter of an inch above the hair line. The head had been twisted "in and up." The gun had been at least six inches away; it could have been eight or ten inches or even farther. The bullet had traveled in a somewhat irregular downward course exiting about one half inch below the left ear causing concussion in the cerebellum and cerebrum sections of the brain.

A ballistics expert from the Wichita police department established by powder patterns found on the hands of both parties that Stewart's right hand had fired the gun and his left hand was eight to twelve inches from the end of the gun barrel. Nan's left hand was closest to the end of the gun barrel and her right hand was some fifteen to twenty-five inches away.

While Stewart was in the El Dorado jail the state sent a doctor to see him to ascertain his mental and physical condition at the time, which was Sunday afternoon, June 27, 1954, at about 1:30 to 2:00 o'clock. Stewart attempted to discuss the events of the last few hours but was told by the doctor that was not the purpose of the visit. The doctor did not testify as to any of the facts regarding the homicide or accident. Stewart's family and background were discussed. The doctor noticed multiple abrasions on Stewart. However, he was not apparently in any great pain nor was he suffering physical injury. On cross-examination the doctor testified he did not know Stewart's physical condition thirty minutes before nor thirty minutes after he saw him.

The court instructed the jury and at the conclusion thereof read into the record eight verdict forms for submission to the jury, which we have abbreviated as follows:

1. We . . . find the defendant . . . guilty of murder in the first degree . . . and fix his penalty in death.

2. We . . . find the defendant guilty of murder in the first degree . . . and fix his punishment at hard labor in the penitentiary . . . for life.

3. We . . . find the defendant . . . guilty of murder in the second degree. . . .

4. We . . . find the defendant . . . guilty of manslaughter in the first degree. . . .

5. We . . . find the defendant . . . guilty of manslaughter in the second degree. . . .

6. We . . . find the defendant . . . guilty of manslaughter in the third degree. . . .

7. We . . . find the defendant . . . guilty of manslaughter in the fourth degree. . . .

8. We . . . find the defendant . . . not guilty.

Deliberations by the jury were begun and at 10:20 p. m. after waiver by both parties of the jury call, a verdict of guilty of murder in the second degree was returned, which was read into the record verbatim by the clerk at the court's direction. This is the only form of verdict which remains in the files of the case for the reason that the trial court discarded the others. The jurors were asked if that was the verdict of each and every one of them and they answered as one, "It is."

Stewart filed a motion for new trial in which he claimed the jury had received evidence, papers, and documents not authorized by the court; there had been admission of illegal testimony and dis-

covery of new evidence not available at the trial; there had been improper separation of the jury after verdict deliberations had started, bias and prejudice on the part of the jurors at the time of taking their oath, misdirection of the jury by instructions given, refusal of Stewart's requested instructions, and finally, the verdict was contrary to the law and the evidence. As has been heretofore stated, these were not all argued to the trial court.

The motion for new trial was argued at length and was overruled. A motion in arrest of judgment was filed, but was not argued, and was overruled after the trial court read it. Stewart was sentenced by the court and immediately perfected the instant appeal.

The over-all nature of this appeal is that appellant did not receive a fair trial. In order to show the trial court's attitude it will be necessary to set out certain details which will serve that purpose and will help to keep some continuity in the record even though some of the summarized evidence also had a bearing on items already disposed of herein.

Counsel for appellant's first objection to be considered here is lodged against the admission of photographs allowed by the court. At the time of the allowance of those most vehemently objected to here, he prevailed on what he actually objected to, which was the use of a screen to show the enlargement of slides and colored pictures. On this feature the trial court was very zealous in protecting the rights of appellant. Photography is recognized more and more by courts as being helpful in presenting facts. The use of colored pictures has been discussed in previous cases on appeal to this court (*State v. Aldrich*, 174 Kan. 335, 255 P. 2d 1027) and no extensive citation of our many decisions is necessary thereon to determine that unless such technical error has caused prejudice to the accused, it will not be considered sufficient to be reversible error. (*State v. Noble*, 175 Kan. 398, 403, 264 P. 2d 479.) This rule applies to criminal as well as other types of cases. (G. S. 1949, 62-1718; 60-3317.)

Another considered objection of appellant goes to the limitation of the cross-examination of Betty Julius who testified she saw appellant and Nan in the drive-in cafe. The question excluded was, "What kind of a profile does he have?" The first impression of this question is that it results in another question as to how the witness could answer it. Absent a showing of prejudice we are not going

to rule on matters of evidence unless it is affirmatively shown that the trial court abused its discretion in admitting or excluding such evidence. (*State v. Zeilinger*, 147 Kan. 707, 708, 78 P. 2d 845.) We have no fault to find with the rule propounded by appellant that great latitude should have been afforded him in cross-examining this witness, but we note the record reflects there was no further effort on his part to cross-examine her. As previously set out herein, she had testified she had seen a full view of the front of appellant's face. Appellant's contention that she was a volunteer witness was not reflected in the record and we will not dwell upon it. The statement cited by counsel for appellant on this point (*Lewis v. Montgomery Ward & Co.*, 144 Kan. 656, 62 P. 2d 875) is quoted only in part. That part of the statement set out is followed by these words,

"Another [rule] is that the extent to which he may be examined is in the sound discretion of the trial court, whose ruling will not be disturbed unless abuse of discretion is made to appear . . .," (p. 662.)

which rule fully applies to the case at bar.

Counsel for appellant next complains that he was unduly limited in his number of character witnesses. Here again the trial court has a wide discretion and unless abuse thereof or prejudice is shown we will not disturb its ruling. Appellant had four such witnesses testify and in addition he was allowed to show he was a navy veteran with service on Guam and the Marianas and had an honorable medical discharge. He had never been arrested in his life. He further admits in his argument that he had excused his witnesses prior to a definite limitation of the court and did not see fit to recall them. In addition, the record before us shows no effort on the part of the state to disparage appellant's character or reputation prior to June 27, 1954. There is no ironclad rule that controls the number of witnesses an accused may use for this purpose. In *State v. Elftman*, 116 Kan. 214, 226 Pac. 795, it was held not to be error to limit the number to ten, and in *State v. Scholl*, 118 Kan. 629, 236 Pac. 824, this court said that while it was illiberal to limit the number of witnesses to three, it was not an abuse of discretion. We are so holding here on this particular objection.

We come next to the age old question of instructions. Only a few of the instructions given by the court are contained in the record and from one of the numbers shown there must have been at least forty-two given. The ones abstracted can be tested only as to whether they are a clear misstatement of the law and were

prejudicial to the trial of the appellant. The question was discussed and disposed of in *State v. Leigh*, 166 Kan. 104, 199 P. 2d 504, where this court said,

"Unless an instruction to which an objection is made is a clear and prejudicial misstatement of the law, it can be reviewed only when other instructions which may or may not qualify its intent and effect are made a part of the record, in order that all may be examined together." (p. 109.)

See, also, *Steck v. City of Wichita*, 179 Kan. 305, 295 P. 2d 1068.

The instructions given by the trial court and included in the record do not appear to be misstatements of the law and so far as appellant's requested instructions are concerned, the trial court went through them and noted and initialed each one. The trial court's notes indicated some of appellant's requested instructions were given, some were given in substance, and some were on subjects not covered in the trial. The balance, if given, may have been clear misstatements of the law and prejudicial to the state.

Another question is was it reversible error to admit, over objection, evidence of remarks made by appellant to officers at the scene of the accident? In regard to this matter, it may be inferred that appellant is complaining about a confession but such is not the case. The statements made by appellant which were testified to by the officers could only be admissions against interest and they were made in the presence of a crowd of people including both officers and laymen. Such admissions against interest are admissible if voluntarily given. (*State v. Smith*, 158 Kan. 645, 149 P. 2d 600.) In *State v. Criger*, 151 Kan. 176, 98 P. 2d 133, the accused was charged with murder in the first degree having taken place on March 13, 1939, and was convicted of second degree murder of his wife, and it was there said,

"It is argued that the testimony of witnesses respecting their conversations with defendant had with him after his arrest was incompetent by reason of the fact that defendant was not specifically told of his constitutional right and was not at the time represented by counsel. Apparently this refers to the transaction of March 16. The trial court ruled that the test as to the admissibility of the evidence was whether the statements were voluntarily made by the defendant. There is no contention they were not so made. We think the ruling correct." (p. 183.)

In our case the only contention is that appellant was in a state of shock and grief which is not sufficient to justify an exception to the rule above stated. The trial court did not err in admitting this testimony. See, also, *State v. Spohr*, 171 Kan. 129, 130, 230 P. 2d 1013.

Appellant contends that his demurrer to the state's evidence should have been sustained and that the verdict was contrary to the evidence. We can see no merit in this contention and will not labor the point.

The next two errors are in regard to instructions. We feel that phase has been heretofore completely and conclusively determined. There is no need to reiterate our past decisions nor our views as already set out herein.

We come now to the final contention of appellant which involves the disposal of the other forms of verdict by the trial court. We know of no case where this was ever brought to the attention of this court, but we are of the opinion that the verdict forms submitted by a trial court are as much a part of the record as any other element, part, or parcel of the lawsuit. The verdict forms should be preserved and placed in the records of the case along with the instructions. Such disposal of verdict forms on the part of a trial court could present some serious questions and the practice is not approved by this court. However, in this case the appellant has failed to show any prejudice to himself as a result of the destruction of the other verdict forms and we will, therefore, treat this as any other technical error. In view of what we have heretofore stated, we will not consider it to be reversible error.

We find no material error in the record before us and the judgment of the court below is affirmed.

FATZER, J., not participating.