No. 44,161

STATE OF KANSAS, *Appellee*, v. BERNARD L. GREENWOOD, *Appellant*.

(421 P. 2d 24)

Opinion filed December 10, 1966.

*Arthur H. Snyder*, of Hutchinson, argued the cause, and was on the briefs for appellant.

*Richard J. Rome*, County Attorney, of Hutchinson, argued the cause, and *Raymond F. Berkley* and *Matthew J. Dowd*, Assistant County Attorneys, of Hutchinson, were with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: The defendant, Bernard L. Greenwood, was convicted by a jury of murder in the first degree, and he has appealed from the judgment rendered, the sentence imposed, and the order overruling his motion for a new trial.

The defendant was a married man and lived in Lyons, Kansas, approximately 30 miles northwest of Hutchinson. The deceased, Lucille Updegraff, was a divorced woman and lived in Hutchinson, Kansas. The defendant was very attracted to Lucille and had spent a great deal of time with her for approximately two years;

they ate together, lived together, made the taverns together, and both drank a lot.

About a week prior to April 29, 1964, the defendant and Lucille discussed whether the defendant's wife was going to divorce him, and he told Lucille he thought she was. During the evening of April 29, 1964, the defendant drove to Hutchinson to see Lucille. He first saw her driving down East Fourth Street and he followed her in his car. She parked in front of the Capri Club, and he parked behind her. Lucille and one John Beasley got out of her car and both went into the tavern. The defendant also went into the tavern and sat down by himself. Lucille did not join him, and this was the first indication that all was not well with their relationship. Being denied Lucille's company, the defendant left the tavern and drove back to Lyons. Later that evening he was arrested for driving while intoxicated.

At about 8:00 or 8:15 the following morning, April 30, 1964, the defendant was released from jail and drove to his home where he took Dristan tablets for a sinus condition and drank some vodka. He continued to drink, and left home to replenish his supply at a liquor store. At about 10:30 a. m. he left Lyons and drove to Hutchinson to see Lucille. Not finding her at home, he looked for her in several taverns, but did not find her. Between 12:00 o'clock noon and 1:00 p. m. the defendant saw Lucille's car going toward the Capri Club and he followed her. Both cars stopped in front of the tavern and Lucille got into the defendant's car. Their meeting ended in an argument and the defendant struck her. Both got out of the car and went into the tavern, but sat at different places at the bar; they had two or three drinks and the defendant left the tavern. He drove to a discount house at the edge of the city limits, and purchased a .22 caliber revolver and a box of .22 shorts. The sale occurred about 2:30 p. m. The defendant told the salesman he was buying the gun for his son, however, the evidence disclosed he had no son.

In the meantime, Lucille lost little time in finding her new friend, Beasley, at the Alibi Club, a tavern located some hundred yards down the street from the Capri. After having several drinks together, they walked to where Lucille's car was parked in front of the Capri. Meanwhile, the defendant had returned to the Capri and was having another drink. About that time, an employee in the Capri looked out of the tavern and said, "here comes Lucille

and Johnny." When they reached her car, both got in, Lucille under the wheel on the driver's side and Beasley on the passenger's side. Before Lucille could drive away, the defendant came out of the tavern, walked up near the window on the passenger's side, which was rolled down, and said something to Lucille, and she said, "Oh, no." The defendant pulled his new .22 caliber revolver and fired two rapid shots, the first hitting Lucille in the forehead squarely between the eyes, and the second bullet went through Beasley's right thumb, entered his cheek and lodged in his throat. After shooting Lucille and Beasley, the defendant walked back into the tavern, finished his drink, and then drove into the country to take his own life. At the trial the defendant testified he did not remember going back into the tavern, driving to the home of Lucille's mother in Hutchinson or leaving there, or driving into the country, but did remember driving to Grace Hospital and going up to the desk, as hereafter related.

Lucille and Beasley were taken to Grace Hospital in Hutchinson where she died in a short time. Instead of taking his own life, the defendant became worried about Lucille and drove to the hospital to see her. He parked in the lot south of the hospital and went in and made inquiry about her condition. He was told Lucille was in "emergency" and that he could not see her. While sitting in the waiting room of the hospital at approximately 3:45 p. m., he was arrested by Sergeant Gangwere of the Hutchinson police department. Gangwere described the defendant as holding his head in his hands, eyes bloodshot, face flushed, with the smell of alcohol on his breath, and he appeared highly emotional and very nervous and his hands were shaking. Gangwere asked the defendant if he was Greenwood and if he had shot Lucille Updegraff, and he answered "yes." He was then asked where the weapon was and the defendant stated it was in the trunk of his automobile and gave Gangwere the keys. Gangwere handcuffed the defendant, and both went to the defendant's car in the parking lot. On the floor of the trunk was a revolver with a white handle. The car was turned over to Officer Frasure of the police department, and the revolver was placed in a property locker at the police station.

The defendant was taken to the police station where he was interrogated by Detectives Sumner and Mangels, who advised him of his constitutional rights. He made oral statements of the events surrounding the shooting, which were reduced to a three-page

written narrative-form statement by the officers and was signed by the defendant at 5:20 p. m. that same day.

The following morning, May 1, 1964, while the defendant was in the city jail, he was questioned by the county attorney in the presence of a court reporter and Officer Mangels, and made a lengthy statement in question and answer form, which he signed at that time.

Later that same day, the defendant was transferred to the Reno County jail, having been charged in the city court of Hutchinson with the deliberate and premeditated murder of Lucille Updegraff. On May 5, 1964, William A. Gossage, judge of the district court, appointed Mr. Arthur H. Snyder, an experienced member of the Reno County Bar, to represent the defendant at the preliminary hearing. On May 15, 1964, a preliminary hearing was held in the city court, and the defendant was bound over for trial in the district court.

In the district court the case was assigned to division No. 1, the Honorable William A. Gossage presiding, and Arthur H. Snyder was reappointed to represent the defendant. Upon arraignment the defendant pleaded not guilty to charge of murder in the first degree and not guilty by reason of insanity.

On May 19, 1964, counsel for the defendant filed a motion requesting the district court to determine the defendant's ability to comprehend his position and make his defense. The court appointed a sanity commission pursuant to K. S. A. 62-1531, consisting of two psychiatrists, Drs. Jack V. Morton and Wilford J. Gardner, of the clinic at Halstead, Kansas. The defendant was examined at the Halstead Clinic, and on May 26, 1964, the commission filed its written report, stating the defendant, "is not insane and that he is able to comprehend his position and make his defense."

Immediately after the district court approved the findings of the sanity commission on May 26, 1964, counsel orally moved the court to appoint a psychiatrist or psychiatrists to examine the defendant for the purpose of inquiring into his mental condition and whether he was insane at the time of commission of the crime charged. The motion further requested that the findings of the psychiatrist or psychiatrists be held privileged to the defendant and that the state not be allowed access to such report. In making his request, counsel referred to K. S. A. 62-1304, that it was his duty as court-appointed counsel to fully and fairly represent the defendant in all respects, and that unless he could obtain psychiatric witnesses necessary or

proper for the defendant, he did not believe the defendant could be fully and fairly represented.

On the following day, May 27, 1964, the district court heard argument of counsel and concluded it had no authority to appoint a psychiatrist wholly for the defendant and that any psychiatrist or psychiatrists to be appointed would have to be for the benefit of the court, and the findings made available to both counsel. The court further stated that in the event the defendant wished an independent examination, it would appoint a psychiatrist or psychiatrists for the benefit of the court, which findings would be available to both the state and the defendant.

On September 23, 1964, counsel orally moved the court for an order allowing the defendant to be taken to the Menninger Clinic at Topeka for a psychiatric examination by Dr. Satten. The motion was sustained, and on September 28, 1964, the sheriff took the defendant to the Menninger Clinic for the examination. During oral argument this court was advised that no report was filed by Dr. Satten for the reason he was able to obtain very little, if any, information from the defendant tending to disclose his lack of mental capacity at the time of the alleged crime.

On October 5, 1964, the case proceeded to trial which lasted three days. The jury returned a verdict, finding the defendant guilty of murder in the first degree, and fixed his punishment at confinement and hard labor in the Kansas State Penitentiary for life. Pursuant to the statute (K. S. A. 21-403), the district court sentenced the defendant in accordance with the jury's verdict.

Counsel timely filed a motion for a new trial, which was heard by the district court on October 19, 1964, and overruled in its entirety. Thereafter, this appeal was duly perfected.

The defendant first contends the district court erred in admitting into evidence the narrative statement signed by him at the police station on April 30, 1964, over his objection, and cites and relies upon *Escobedo v. Illinois,* 378 U. S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758. In making the contention, the defendant concedes that what was said and held in *Miranda v. Arizona,* 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, as construed and applied in *Johnson v. New Jersey,* 384 U. S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772, is inapplicable to the instant case since it was tried prior to the *Miranda* decision. Likewise, the contention has no reference to the question and answer statement given to the county attorney on May 1, 1964, since the

defendant himself offered that statement in evidence at the trial.

Upon the defendant's objection to the statement, the district court followed the established procedure of this state in determining whether statements or confessions of a defendant were freely and voluntarily made without force or coercion. See, *State v. Seward,* 163 Kan. 136, 181 P. 2d 478; *State v. Stubbs,* 186 Kan. 266, 346 P. 2d 936, cert. den. 363 U. S. 852, 4 L. Ed. 2d 1734, 80 S. Ct. 1632, and *State v. Latham & York,* 190 Kan. 411, 435, 375 P. 2d 788, cert. den. 373 U. S. 919, 10 L. Ed. 2d 418, 83 S. Ct. 1310. The court excused the jury and heard the testimony of the police officers concerning the defendant's arrest, his transportation to the police station, and his oral statements subsequently reduced to writing. ·

Captain Goering, of the detective division of the police department, testified he first saw the defendant in the parking lot south of Grace Hospital at about 4:00 p. m. and placed him in the back seat of his police car between Lieutenant Wilson and Officer Ralston and that Detective Sumner was in the front seat with him; that as they started to drive to the police station, the defendant began "talking" about his shooting Lucille but did not direct his conversation to any one particular officer. Goering advised the defendant that before he made any statements, he (Goering) was required to advise him of his rights and he said, "I know my rights." Goering advised the defendant he could remain silent; that he could have legal counsel before making a statement, and that any statement he made could be used against him in court, and the defendant said, "I went to Gibson's and bought a gun and shot Lucille, and I think I shot someone else but I am not certain." Goering further testified that upon arrival at the police station the defendant was turned over to Detectives Sumner and Mangels.

Detective Sumner testified he considered the defendant was in custody and that he had not formally been charged with a crime; that he and Mangels interrogated the defendant at the police station and advised him that any statement he might make could be used against him in court; that he had the right to remain silent and to consult an attorney before making any statement, and at that point the defendant said he "didn't need an attorney, that he was guilty." Sumner further testified the defendant was not represented by counsel when he was interviewed and when he signed the statement; that he (Sumner) prepared the statement from questions asked and answers made by the defendant; that it was not a question

and answer statement but contained the facts of the case in a narrative form as a result of the interview; that the defendant made the statement of his own free will without threat or promise of immunity, and that before the defendant signed the statement he was again advised it could be used in court against him and that he had the right to have legal counsel before signing it.

Detective Mangels' testimony was substantially that of Detective Sumner.

After hearing the evidence out of the presence of the jury, and in the presence of the defendant and his counsel who made extensive and pointed cross-examination of all of the police officers, the district court concluded the defendant's written statement was freely and voluntarily given; that it met constitutional requirements, and was admissible in evidence. Thereafter, the jury was recalled and the testimony of the police officers with respect to the statement was adduced in full. The statement recited facts most of which have been heretofore set forth.

We think there was ample evidence to support the district court's finding the defendant's statement was freely and voluntarily given, and that it was admissible in evidence. No threats were made and there was no coercion or misrepresentation. On the contrary, the record clearly reflects that, despite the admonitions of the police officers, the defendant stated, "I know my rights"; that he "didn't need an attorney," and freely discussed and voluntarily made detailed statements to the police officers of how and why he killed Lucille. The record is completely void of any threats or promises being made; nor was there any physical violence of any kind whatsoever. No other conclusion could be reached by the district court, or by this court upon appellate review, but that the defendant's written statement was freely and voluntarily given and was admissible in evidence. Moreover, the absence of an attorney when the defendant made the oral statements and signed the written statement does not, under the circumstances which attend, render the statement inadmissible. (*State v. Jenkins*, 197 Kan. 651, 421 P. 2d 33, and cases cited therein; *State v. Latham & York*, supra, p. 435.)

The state concedes that since *Escobedo v. Illinois*, supra, was decided June 22, 1964, before the defendant's trial, the procedural safeguards outlined in that opinion are applicable. Be that as it may, we are of the opinion that under the record presented, the

"in custody interrogation" restrictions announced therein have no possible bearing upon the admissibility of the defendant's written statement. It is unnecessary to review *Escobedo* in this opinion, but it is sufficient to say that case does not hold that a statement made by an accused during police interrogation prior to his being formally charged with a criminal offense and found by a district court to have been freely and voluntarily given, is constitutionally inadmissible in evidence, where, as here, the accused is advised of his right to remain silent, to consult with an attorney before making a statement, and that any statements he might make may be used against him in court. *Escobedo* does not require Kansas to eliminate its independent, well-settled state rule relating to the admissibility of voluntary statements and/or confessions of an accused under the facts disclosed in this record. We reject the defendant's contention, and hold the district court did not err in admitting the written statement in evidence and in instructing the jury as to the manner it should be considered.

The defendant next contends the district court unduly restricted his cross-examination of John Beasley, the state's chief witness and the only eyewitness to Lucille's killing, which substantially prejudiced his rights. It was the defendant's theory the decedent's death could have been caused by reason of a fight over the gun between Beasley and the defendant, or that Beasley, in his excitement, grabbed for the gun and it went off, killing the decedent. There was evidence of powder burns on the decedent's forehead, indicating the revolver was discharged at close range. Beasley testified he saw the defendant coming toward the car from the south or from his right; that he did not see the gun until the defendant fired the first shot; that the defendant was not standing against the car, "but he was close" to the window; that he did not know what happened after the defendant shot, but he did not reach to get the gun until after the first shot; that the bullet from the second shot went through the upper part of his right thumb, into his jaw, and lodged in his throat.

Counsel had the complete transcript of Beasley's testimony at the preliminary hearing, and used it extensively during his cross-examination at the trial. Whether the gun was fired inside or outside the decedent's car, it is clear the defendant fired the shot that killed Lucille. The record demonstrates the district court gave counsel considerable latitude and was patient and lenient in his cross-

examination of Beasley. Our decisions recognize that the extent to which cross-examination of a witness may be allowed is in the sound discretion of the district court, and its ruling will not be disturbed unless abuse of discretion is made to appear. ( *State v. Rowland*, 172 Kan. 224, 239 P. 2d 949, 30 A. L. R. 2d 455; *State v. Stewart*, 179 Kan. 445, 296 P. 2d 1071.) There is nothing in the record to indicate the district court abused its discretion and the defendant's contention cannot be sustained.

In connection with the point just discussed, the defendant next contends the district court permitted the state to impeach one of its own witnesses. Dr. Hans T. Lettner was called as a witness for the state and testified he performed an autopsy on Lucille Updegraff on May 1, 1964; that the cause of death was massive brain hemorrhage from a fatal bullet that had penetrated the forehead, entered the skull, and lodged in the back of the brain; that he had knowledge of ballistics and from the powder burns around the bullet wound, the gun must have been held a half yard from the decedent and it was possible the gun was fired inside the car rather than outside the car. The next day Dr. Lettner was recalled by the state and testified he was not certain about the "ring" on the forehead of the decedent; that he had contacted ballistic experts, and, over the defendant's objection that the state was trying to impeach its own witness, the district court stated:

"What I am trying to determine is if this witness wants to change his testimony, and if he wants to change his testimony, he certainly can, and you have every right to cross examine him about it."

Dr. Lettner was then asked his opinion as to the distance between the point of impact and the revolver and, over the defendant's objection, he testified the distance was greater than one and a half feet, approximately one yard, and the projectile was slightly from above.

We think there was no error in the ruling. In *State v. Hooper*, 140 Kan. 481, 503, 37 P. 2d 52, it was said that a witness for the state could correct a statement he had made in his former testimony. The object of any trial is a search for the truth. If a witness has time to reflect as to what he has testified to and then decides in good conscience that his testimony should be changed, the court has the discretion of allowing him to change his testimony. Counsel was permitted to fully cross-examine Dr. Lettner and it was within the province of the jury to weigh his testimony. No abuse of dis-

cretion being shown, the district court did not err in permitting Dr. Lettner to change his testimony.

The point is made the district court erred in failing to appoint a psychiatrist to examine the defendant for his exclusive benefit. We think no prejudicial error was committed. As indicated, the sanity commission consisted of two psychiatrists who examined the defendant and found him to be sane. Later, at the defendant's request, the district court directed he be taken to the Menninger Clinic at Topeka for an examination. This was done. Dr. Satten was unable to obtain information from the defendant to determine his lack of mental capacity at the time of the alleged offense, and he made no report to the court. In view of this fact, it is unnecessary to pass upon the question whether the defendant was entitled to a psychiatric report for his exclusive benefit.

The defendant forcefully argues the state's evidence failed to prove beyond a reasonable doubt his guilt of murder in the first degree and contends he should have been charged with a lesser crime, claiming the evidence failed to show premeditation and malice aforethought. The point is not well taken. The jury was given the alternative of finding the defendant guilty of either first or second degree murder. Instruction No. 7 reads:

"Under the laws of Kansas the word 'murder' is used in its common law sense, that is, as being the intentional killing of a human being with malice aforethought. The essential and indispensable ingredient of murder in either degree is 'malice aforethought' which means with a wicked purpose or intention, or with total disregard of social duty, and no homicide can constitute the crime of murder in either the first or second degree, nor can the defendant be convicted of either degree of murder, unless it was committed with malice aforethought.

"Murder in the first degree is distinguished from murder in the second degree in that the former must have been committed either with deliberation and premeditation or in the commission of a felony, while these elements are not present in the latter. A homicide is committed 'deliberately and premeditatedly' when it has been planned beforehand and after reflection, although no particular length of time must intervene between the time it was contrived and the time it was consummated, for any length of time is sufficient if it affords opportunity to consider the manner and consequences of the act.

"For you to determine whether a murder is in the first or second degree it is only necessary that you decide whether it was committed deliberately and premeditatedly, or whether it was not so committed, and if the former then it is first degree murder, and if the latter, second degree murder."

The defendant makes no complaint as to the form of the instruction or that it did not state the material elements of the crimes of

murder in the first and second degree. Our law recognizes that the jury shall be the exclusive judge of all material questions of fact. Likewise, the jury is entitled to draw reasonable inferences from the evidence and is the judge of the inferences as well as of the established facts. (*State v. Jensen*, 197 Kan. 427, 417 P. 2d 273.) Implicit in the verdict was a finding that the act of the defendant was occasioned by premeditation and malice aforethought such as to render the killing, under the court's instruction, murder in the first degree. This court may not set aside a verdict if the conviction is supported by evidence. (*State v. Morrow*, 179 Kan. 63, 292 P. 2d 1094.)

It is unnecessary to further summarize the evidence except perhaps to quote from the defendant's statement concerning the killing. He said:

"I was mad and drunk, and I just walked up to the car and pulled the trigger of the gun I had. I think I shot Lucille first, and then shot Johnny second. Have no idea how many times I fired the gun."

A man is presumed to do that which he actually does and to intend the consequences which naturally and probably flow from his voluntary act. (*State v. Donahue*, 197 Kan. 317, 416 P. 2d 287.) Moreover, implied malice or malice in law may be inferred from the use of a deadly weapon. (*State v. Dull*, 67 Kan. 793, 74 Pac. 235.) A thorough reading of the record discloses an abundance of evidence for the jury to draw an inference of premeditation and malice aforethought, as well as an intent to kill the deceased.

The defendant mentioned a point in his brief which warrants comment. After the jury retired to deliberate upon its verdict, it requested the court to further define the term "malice aforethought." The court prepared Additional Instruction No. 1, which was read to the jury over the defendant's objection. No claim is made it did not correctly define malice aforethought. We have examined the instruction and it merely enlarged upon the definition given that term by the court in Instruction No. 7.

Counsel for the defendant has been diligent in advancing claims of error which we have meticulously examined to determine whether any possible error prejudicial to the rights of the defendant occurred. Our review of the record compels the conclusion that the defendant was given a fair and impartial trial and no ground exists which would require a reversal. The judgment of the district court is affirmed.