No. 45,215

Frank Frame, Administrator of the Estate of Bertha E. Bauman, Deceased, *Appellant,* v. Marion R. Bauman and Boyce A. Bauman, *Appellees.*

(449 P. 2d 525)

Opinion filed January 25, 1969.

*Eldon L. Meigs,* of Pratt, argued the cause and was on the brief for the appellant.

*B. V. Hampton,* of Pratt, argued the cause, and *Bill Murray* and *Bill Hampton, Jr.,* both of Pratt, were with him on the brief for the appellees.

The opinion of the court was delivered by

FONTRON, J.: When, in the year 1923, Frank Bauman took Bertha Frame as his second wife, it is doubtful that either party could have foreseen the tempest which would rage over their wordly possessions, once they had finished with them. The record presently before us mirrors the violence of the storm that has ensued.

This action was filed by Frank Frame, Bertha's brother, as the administrator of her estate. The defendants are two brothers, the

only sons of Frank Bauman, and stepsons of Bertha. The plaintiff administrator seeks to set aside certain conveyances made by Bertha to her stepsons after Frank's death. The trial court, after a lengthy hearing, entered judgment in favor of the defendants, Marion and Boyce Bauman, and the administrator has appealed.

Although the evidence was highly conflicting for the most part, many of the facts forming the background of this lawsuit were not in dispute.

Bertha had no children of her own, while Frank, at the time of his marriage to Bertha, had two boys from a former marriage, Boyce and Marion, then approximately eight and six years of age. The marriage was apparently a happy and successful one. Bertha made a good home for Frank and the two boys, caring for the boys like a mother. Both boys called Bertha "Mom" and we think it is evident from the record that relations between Bertha and her stepsons were close and affectionate.

Frank Bauman died testate on March 11, 1964. Under his will, to which Bertha had consented, Bertha took approximately one-third ($\frac{1}{3}$) of the estate in value, and Frank's two sons took the remaining two-thirds in approximately equal shares.

On July 19, 1965, Bertha died intestate, leaving an estate consisting of an 80-acre farm in Barber County, which she owned at the time of her marriage to Frank, together with bonds and cash in an undisclosed amount. The record indicates Bertha's gross estate to be slightly over $40,000.

The three transactions which gave rise to this lawsuit took place after Frank's death in the following sequence:

Frank Bauman owned an interest in certain Texas real estate which originally had belonged to his father. Under Frank's will, a one-half interest in this property passed to Bertha and the other half to Boyce and Marion, jointly. On April 25, 1964, Bertha entered into a written agreement in which she agreed to convey her interest in the Texas land to Boyce and Marion in consideration of their agreement to pay her their share of the oil and gas royalties, in addition to her own, so long as she lived. Royalty payments from the entire property amounted to some $210 per month. Pursuant to this agreement, Bertha conveyed her interest in the fee, and the oil royalty payments going to Bertha are presently a part of her estate.

Under date of July 13, 1964, Bertha conveyed to Boyce and Marion Bauman, by duly executed warranty deeds, eighty (80)

acres of land in Reno County, Kansas, one hundred sixty (160) acres in Pratt County, Kansas, and three hundred twenty (320) acres in Baca County, Colorado, for the sum of $21,500, and reserving unto herself a life estate in all three pieces of real estate.

The final transaction occurred October 21, 1964, when Bertha purchased a house in Turon, Kansas. Title to this property was conveyed by the seller to Bertha E. Bauman and Marion R. Bauman as joint tenants.

Highly summarized, the plaintiff's petition alleges that between the dates of Frank's and Bertha's deaths, Bertha, who was approximately 78 years of age, was in poor physical and mental condition, having previously spent two periods in the Larned State Hospital; that Marion Bauman took charge of Bertha's affairs, and made all decisions of consequence; that Bertha became wholly dependent on Marion and a confidential relationship came into being between them which existed at all times during which the transactions heretofore noted took place; that all of the conveyances were obtained from Bertha through undue influence and overreaching; that the consideration for all the conveyances was inadequate and that Bertha was not afforded independent advice in connection with the transactions. The plaintiff prayed for cancellation of the deeds, for a reconveyance of the properties, and for an accounting.

For their answer, the defendants admitted the conveyances, denied any undue influence, harassment or misrepresentation, and alleged that the conveyances were made for valuable consideration and according to Bertha's wishes.

The case was tried to the court, and consumed four days time. At its conclusion the trial court entered extensive findings which so far as need be set out at this point may be summed up in this wise: that Bertha was mentally competent and of sound mind at all times involved in this action; that a confidential relationship existed between Bertha Bauman and the defendant, Marion Bauman; that the defendants had the burden of showing all the conveyances were knowingly made, and were not induced by undue influence; that the defendants' evidence met such burden and overcame the presumption of undue influence in this case; that all conveyances were freely, voluntarily and knowingly made by Bertha Bauman, who was satisfied with what she had done and that she never took any overt action during her lifetime to set aside or retract her actions.

The court concluded by finding generally in favor of the defendants and against the plaintiff. We will have occasion to refer to specific findings, not summarized above, later on in this opinion.

During his case in chief, the plaintiff called Marion Bauman as his witness, and examined him. He now complains, as his first point on appeal, that defense counsel was permitted to cross-examine Marion concerning matters not touched on direct examination. We have carefully examined both the direct and cross-examination, and while the latter may have gone beyond the direct in a few instances, we cannot say the trial court abused its discretion in overruling objections to the cross-examination, or that any prejudice is shown to have resulted therefrom to the plaintiff.

This court has held in general that a good deal of latitude should be afforded in the cross-examination of witnesses; that the trial court is vested with discretion in determining the scope thereof; and that its rulings on objections interposed to questions asked on cross-examination will not be disturbed in the absence of a showing that its discretion has been abused. (*State v. Carter,* 148 Kan. 472, 83 P. 2d 689; *State v. Stewart,* 179 Kan. 445, 296 P. 2d 1071; *State v. Greenwood,* 197 Kan. 676, 684, 421 P. 2d 24.)

Although plaintiff asserts that Marion was called solely to identify exhibits and to establish the existence of a confidential relationship between himself and his stepmother, his testimony on direct examination concerned matters which lay at the very heart of this lawsuit; it opened more doors than plaintiff may have realized or bargained for. In the early case of *Schuster, Tootle & Co. v. Stout & Wingert,* 30 Kan. 529, 2 Pac. 642, the syllabus reads, in part:

"It is a general proposition that a cross-examination may extend to *all* matters drawn out on the direct examination. . . ." (Emphasis supplied.)

In the recent case of *Humphries v. State Highway Commission,* 201 Kan. 544, 442 P. 2d 475, this court cited Schuster with approval. We also quoted, in the Humphries opinion, a passage from 58 Am. Jur., Witnesses, § 632, p. 352, reciting in substance, that when direct examination has opened up a general subject, the cross-examination may go into any phase thereof and may extend to the entire subject matter; it is not restricted to the identical details developed on direct examination or the specific facts testified to in chief.

The record discloses no abuse of discretion. But even though the cross-examination could be said to have exceeded proper limits, there is no showing of prejudice to the plaintiff. (*Minx v. Mitchell,*

42 Kan. 688, 22 Pac. 709; *Thompson v. Barnette,* 170 Kan. 384, 227 P. 2d 120.)

The plaintiff further complains that the trial court refused to permit inquiry into alleged irregularities in Marion's administration of his father's estate. We discern no error in this respect. Marion's final account had been approved by the probate court and an order of final settlement entered. No appeal was taken from that order and it is not subject to collateral attack. (*Middendorf v. Kansas Power & Light Co.,* 166 Kan. 610, 203 P. 2d 156.)

It is urged, however, that evidence of discrepancies occurring in the administration of Frank Bauman's estate, if proved against Marion, would be admissible under the provisions of K. S. A. 60-455 as tending to show motive, opportunity, intent, preparation, plan, etc. We are not impressed with this argument. In the first place, we are not convinced that irregularities in the administration of Frank's estate are sufficiently similar in character to the alleged exercise of undue influence upon Bertha to come within the purview of 60-455. Moreover, we believe the general rule to be as stated in 32 C. J. S., Evidence, § 578, p. 703:

"The trial court has a wide discretion with respect to the admission of evidence of similar acts or occurrences as proof that a particular act was done, or that a certain occurrence happened."

We are aware that the admission of evidence of this character may involve the practical inconvenience of trying collateral issues which protract the trial and that it may, also, surprise the opposing litigant to his prejudice. In exercising its discretion in this area, the trial court must consider not only the extent of similarity, and the presence or absence of modifying conditions, but the foregoing possibilities, as well. We believe that no abuse of discretion is shown.

Objection is next made to the trial court's finding that Bertha was mentally competent and of sound mind at all times material to this action. In support of this objection the plaintiff says he never contended otherwise. He should examine his own petition and read the record of trial. In paragraph three of his own pleading he depicts Bertha as "of a very questionable mentality, having spent two periods of time previously in the Larned State Hospital for the insane."

The record is full of references to Bertha's stays at the State Hospital. In the plaintiff's Supplemental Record are page after page of staff reports concerning Bertha's condition. Among other

examples of the aspersions cast upon her mentality, we note that during Marion's cross-examination, plaintiff's counsel offered a deed in evidence signed by Bertha on October 23, 1964, "to show the court the difference in signatures *as showing that her mind was slipping.*" (Emphasis supplied.) Plaintiff's objection to the finding is wholly unjustified.

The main thrust of the plaintiff's attack is leveled against the trial court's salient findings. Although couched in various and alternative ways, the remaining points of error challenge the sufficiency of the evidence to support the findings and the judgment based thereon. A determination of the question will dispose to the appeal.

We shall not attempt to compare the version of events related by members of the House of Bauman, and that given by members of the House of Frame. The two versions were, to say the least, contradictory in their total impact. A lone exception is found in the testimony of Kendall Means, a blood nephew of Bertha who will inherit a share of her estate. Mr. Means appeared as a defense witness, and his testimony largely corroborates the Bauman version.

As we have previously said, the trial court found a confidential relationship to exist between Bertha and her stepson, Marion. Accordingly, the court placed the burden upon the defendants to show that the transactions between Bertha and themselves were conducted in good faith and that Bertha's conveyances were not induced by undue influence. With this ruling we agree. The law governing transactions entered into by parties between whom a confidential relationship exists is applicable to this case even though a fiduciary relationship may not have existed between Bertha and Boyce. Marion could not legally have obtained a conveyance to himself through the exercise of undue influence; neither could he legally have secured a conveyance to his brother by such means. (*Miller v. Henderson,* 140 Kan. 46, 52, 33 P. 2d 1098; *Rathbun v. Hill,* 187 Kan. 130, 143, 144, 354 P. 2d 338; *Windscheffel v. Wright,* 187 Kan. 678, 688, 689, 360 P. 2d 178, 89 A. L. R. 2d 636.

A confidential relationship, however, does not poison or brand as fraudulent every transaction between parties, one of whom occupies a fiduciary status toward the other. Where good faith has been established on the part of the beneficiary and no undue influence has been exerted, and where the transaction under scrutiny is shown to have carried out the true and freely formed intentions of the grantor, the law does not stigmatize it as fraudulant and void

simply because of the relationship existing between the parties. The rules applicable to transactions between individuals, where a confidential relation exists, are not intended to preclude gifts which honestly reflect the unfettered wishes of those who make them but, rather, are intended to prevent persons who stand in positions of confidence and trust from taking advantage of their positions at the expense of those entitled to their loyalty and protection.

Whether in fact a conveyance has been induced through the exercise of undue influence on the part of a party standing in a confidential relationship to the grantor, is primarily a question of fact to be determined by the facts and circumstances which attend the particular case. In the recent case of *Cersovsky v. Cersovsky,* 201 Kan. 463, 441 P. 2d 289, this court said:

". . . The test of undue influence is whether the party exercised his own free agency and acted voluntarily by the use of his own reason and judgment, which may be determined from all the surrounding circumstances, including the relation of the parties, the time and manner of making suggestions or giving advice, the motive, if any, in making suggestions, and the effect upon the party so acting. (*Homewood v. Eggers,* 132 Kan. 256, Syl. ¶ 5, 295 Pac. 681.) . . ." (p. 467.)

It is for the trial court to determine, in the first instance, whether the presumption of undue influence existing by virtue of a confidential relationship has been satisfactorily overcome by the party on whom the burden rests. That court bears the responsibility of weighing conflicting evidence and assessing the credibility of witnesses.

Under familiar rules, our responsibility on appeal is to ascertain whether the findings of the trial court are supported by substantial competent evidence. (*Cersovsky v. Cersovsky,* supra.) In making this determination, we are required to consider the evidence in its most favorable aspect in relation to the party who prevailed in the court below. (*Riedel v. Gage Plumbing & Heating Co.,* 202 Kan. 538, 449 P. 2d 521.)

We have heretofore mentioned that the trial court found no undue influence was exercised by either defendant, but all conveyances were freely, knowingly and voluntarily executed by Bertha. We think this finding is substantially supported by the record.

Turning to the transaction of April 25, 1964, concerning the Texas oil property, we note the trial court's finding that "no independent advice was received by Bertha Bauman regarding the Texas property but this court is unable to find that undue influence

was used or that either defendant intended to take advantage of their stepmother."

It is argued that Bertha's conveyance of the Texas land is void for lack of independent advice. However, the requirement of independent advice does not extend to every transaction between parties, one of whom is the confidant of the other. The rule is applicable only where the circumstances of the situation so warrants.

In the recent case of *In re Estate of Carlson*, 201 Kan. 635, 443 P. 2d 339, we had occasion to review our decisions on this subject, and held:

"The requirement of independent advice is designed to provide assurance that the aged or infirmed or otherwise dependent person conferring the benefit knew what he was doing and did it of his own free act and will, and to see that no undue advantage was taken of him.

"The rule of independent advice is applicable only under circumstances where the evidence warrants it. Our decisions do not require application of the rule where the beneficiary or party upon whom is cast the burden of proof presents substantial evidence that the gift, deed or contract was made in good faith, not induced by undue influence, and for a valuable consideration. (Following *Jernberg v. Evangelical Lutheran Home for the Aged*, 156 Kan. 167, 131 P. 2d 691.)" (Syl. ¶¶ 5, 6.)

In the course of its opinion, the court, speaking through Mr. Justice Fatzer, had this to say:

"The existence of a confidential or fiduciary relationship between persons does not, as a matter of law, operate to bar the right of the beneficiary to enter into a contract or to receive a gift. If the person who conferred the benefit was at the time of sound mind and clearly understood the transaction, and executed a free will in the act, being under no restraint or undue influence, and, where the evidence requires it, there was adequate consideration, the transaction will be sustained. While we have no desire to detract from our decisions applying the rule of independent advice if the circumstances warrant it, the evidence clearly does not require its application in the instant case. (*Jernberg v. Evangelical Lutheran Home for the Aged*, supra; *Barger v. French*, supra.)" (pp. 645, 646.)

The Texas property was so-called "Bauman land." It had descended from Frank Bauman's father. There is considerable evidence in the record that Bertha wanted "the boys," Marion and Boyce, to have the "Bauman land." Moreover, Bertha's conveyance cannot strictly be said to have been without consideration. She bargained her interest in the fee for a lifetime interest in the royalty payments. While, at first blush, the consideration might appear inadequate, it is clear from the record that Bertha's primary concern

was income. Who can say the consideration was not a sufficient *quid pro quo* in Bertha's eyes?

The trial court specifically found Bertha received independent advice in regard to deeding the farms. The record supports this finding. Mr. F. B. Hettinger, of Hutchinson, a member of the bar of this state and a former district judge, is shown to have prepared the deeds to the three properties as well as a revocation of a power of attorney which Bertha had previously given to Louis Frame, a nephew. Judge Hettinger took the papers to the bank at Turon where he talked to Bertha about the deeds out of the presence of the defendants, both of whom had left the room to see the bank's president about raising the money to pay for the land. The judge's conversation with Bertha took place, for the most part, with her alone although Mr. John W. Shive, vice-president of the Turon State Bank, was present part of the time.

Judge Hettinger's testimony is significant, not only on the question of independent advice, but as an aid in understanding Bertha's motives in conveying the farms and the cordial and affectionate relationship existing between her and the stepsons. Mr. Hettinger testified that he first asked Bertha if she realized what she was doing—that she was selling the land to the boys but would get all the income for the rest of her life, to which Bertha replied "Yes, I want the income."

Continuing, Judge Hettinger computed the income Bertha would get from $20,000 in "H" bonds which she planned to buy with the money from the sale; estimated what she would receive from the farm income; added these together and, after deducting taxes, arrived at a net; divided this by twelve; and then told Bertha she would have an income of something over four hundred dollars ($400) per month; his testimony continues:

". . . Then I told her, 'Now, you understand that when you sign these deeds, this land will all belong to the boys when you are gone and your brothers and sisters and nieces and nephews will get the bonds and what money you have in the bank and any other personal property you might have but they won't get this land, this will belong to the boys,' and she said, 'Well, I want the boys to have it.' She said, 'It's Bauman land and the boys should have it,' and I said, 'Well, that's right, it is Bauman land but you don't have to sign it away if you don't want to,' and she said, 'Well, I want them to have it but I want the income, I want the income.' I think three or four times at least during our conversation she said, 'Well, I want the income.' She seemed to have that very much on her mind. And when I told her this approximate figure she'd

get per month of income, she said, 'Oh, that is a lot of money,' and I said, 'Yes, it is, it's a lot more than you will spend,' and so that was about the gist of our conversation. . . ."

Mr. Shive testified that after Judge Hettinger concluded his talk with Bertha, portions of which he had heard, the judge stepped out of the room and he, Shive, asked Bertha if she thoroughly understood what it was all about; that she said yes, but wanted to know if it was drawn up in proper form; that he said it looked all right to him, and Bertha then signed and he acknowledged the papers.

After assessing the Hettinger and Shive testimony, only a fractional part of which has been cited, we believe it clear that the finding of independent advice as to the farm conveyances is supported by substantial competent evidence. An outcry is raised against Judge Hettinger as being the Baumans' personal attorney. The record, however, reflects that he was only the attorney for Marion, as executor of his father's estate; that he considered the drafting of the deeds to be a part of the estate business; that he has never been paid by either Marion or Boyce personally, nor does he expect to be; and that he refused to represent them in this action.

The judge's meticulous explanation to Bertha, which he testified was given to satisfy himself that she knew what was going on and that her rights were being protected, should suffice to dispel any genuine doubt as to his impartiality. Judge Hettinger is known to this writer as a respected member of the Reno County bar, as well as an able lawyer. We believe his advice to Mrs. Bauman was substantial and sufficient.

Bertha's conveyance was not wholly without consideration. She received $21,500, one-half the appraised value as filed in Frank's estate, plus reserving a life estate. It happens that she did not long survive Frank—some sixteen months—but the trial court found "no one on earth could predict for how long she might live." The record supports this finding. There is even evidence that Mr. Shive told the defendants that in view of Bertha's health, they might be making a bad deal.

It was stipulated that Bertha bought a house from Irv Bauman in October, 1964, for $10,500; that it was titled in joint tenancy with Marion; and that at the time of trial (November, 1966,) it was valued at $6,750. The evidence concerning the transaction is somewhat scarce. Marion testified he had nothing to do with the pur-

chase; that when he first heard of it, shortly before Bertha's purchase, he did not think she should move from where she was, and told her she had a good place; that Bertha called and wanted to go to the bank; that he took her to the bank and left her there; on his return to the bank he found she had taken a joint tenancy deed with himself named as joint tenant.

John Shive testified that when he drew up the deed only Irv Bauman, Irv's wife and Bertha were present; Marion was not there at the time. He further testified:

"I drew the deed and asked her how she wanted it made and she told me she wanted Marion put in as a deed in joint tenancy, and that is the way I drew it."

Mr. Shive also stated he was satisfied Bertha was competent and capable on that occasion, and knew what she was doing; that he loaned her $6,500 to complete the purchase and her note is still at the bank, although some of it has been paid.

Related to this purchase is Bertha's sale of her former home. There is evidence that Bertha wanted a house located closer to Ella Lamont, the woman who looked after her, since Ella did not like walking to the edge of town. Two days after buying Irv's place, Bertha sold her old house. Mr. Buckwalter, the buyer, had thought the original asking price too high, so his wife went to see Bertha and the two women arrived at the final figure. The circumstances, in their entirety, justify the conclusion that Bertha engineered the deal, and we cannot quarrel with the court in finding there was no evidence that Marion influenced his stepmother in buying the house and including his name on the deed.

There is other evidence of record which can be said to support the court's findings. Sampling a bit of this evidence, we find the testimony of Luke Chapin, an eminent and capable lawyer of Barber County bar, to whom Louis Frame took Bertha after she had conveyed the farms.

During the conference, Mr. Chapin inquired of Bertha what she would do with her property, if it were returned to her, and Bertha said very probably, or possibly (Chapin was not sure which), the stepsons would receive the property or share therein on her death. Chapin then told Bertha she had no need for his services unless she made up her mind to set aside the arrangements already made and make different ones. Bertha did not return to Mr. Chapin after that.

It may be conceded that evidence introduced on behalf of the

plaintiff would have provided support for findings contrary to those returned by the trial court. Such, however, is not the standard by which evidence is measured to ascertain whether the findings are sufficiently supported. (*Sullivan v. Sullivan*, 196 Kan. 705, 413 P. 2d 988.)

Before closing the book on this opinion, we are constrained to comment on certain procedural irregularities which this case presents. The record is in three volumes, the first being produced by appellant, the second by appellees, and a third, designated as a supplemental record, again by the appellant. This proliferation apparently originated when appellant failed to reproduce what appellees designated for inclusion in the record.

It is impossible to say what was contained in the designation of either party, since the designations, themselves, have not been reproduced. Rule 6 (*q*) provides in part that the reproduced record *shall always include the designation or stipulation of the parties as to matters to be included* in the record. Had the appellant complied with this provision, much of the bickering between counsel might have been avoided.

As we understand from motions filed with this court, the appellant objected to much of appellees' designation either as unnecessary, since it was already set out in the record, or as immaterial. The upshot was that appellees were reluctantly granted leave to prepare a separate record.

Orderly appellate procedure is delineated in our rules. Rule 6 (*d*) requires an appellant to serve and file with his designation a statement of points on which he intends to rely. This, the appellant failed to do. The rule further provides that after appellant files his designation and statement of points other parties to the appeal may serve and file counter designations containing additional matters to be included.

After all designations have been filed, the appellant shall reproduce the record. The record as reproduced *shall contain all matters designated by the parties*. If the appellant believes the appellee has designated material which is duplicitous or irrelevant, his remedy is to apply to the district judge to require appellee to advance such costs of reproduction as the judge deems appropriate. The record shall then contain a statement of the respective portions of the expense paid by each party. (See rule 6 [*g*] and [*h*].)

474

We have before us a motion to tax, to the appellant, the cost of printing the record which appellees prepared. As we read the appellees' production, it duplicates a good deal of the material contained in the original record. After due reflection, we believe it fair to tax one-half the cost of printing the record prepared by appellees, to the appellees themselves, and the balance thereof against the appellant. Other costs on appeal are assessed to the appellant.

The judgment is affirmed.